[S.F. No. 22650. In Bank. July 29, 1970.]

ANTHONY J. BARREIRO, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

**COUNSEL**

Beadle, Tully & Axelrod and Philander Brooks Beadle for Petitioner.

F. LaMar Forshee and Herbert M. Rosenthal for Respondent.

**OPINION**

**THE COURT.**—This is a proceeding to review a recommendation of the State Bar of California that petitioner be suspended from the practice of law for a period of six months on conditions of probation, including actual suspension for the first three months.

*Facts:* Petitioner was admitted to practice law in this state in July 1952 and has been in active practice ever since. His office is in Hanford. The complaining witness is Mrs. Janice Barba, whom he agreed to represent in a divorce proceeding in Kings County. She was 21 years old, a housewife with two small children and was not experienced in business affairs. She and her husband had a very modest income ($8,000-$9,000 a year). There was no fee agreement. At his request she paid him $150 cash. It was her understanding that she would get the $150 back when he collected fees from her husband in the court proceeding. In that action he requested the payment of reasonable attorney's fees in the sum of $350 plus costs, and represented that the wife had no funds or property with which to prosecute the action. He did not disclose to the court the payment to him of the $150

by the wife. Three hearings were held on the order to show cause, and he obtained a court order for the payment to him by Mr. Barba of $250 attorney's fees. The complaint and answer were then filed, attorney Ernest W. Dunn representing Mr. Barba. Before any further proceedings were held the parties reconciled.

After the reconciliation Mrs. Barba offered to pay the difference between the $150 she had already paid and the $250 ordered by the court, but he refused and demanded an additional $75. He directed the constable to proceed with levy of execution on personal property of the Barbas (essentially equipment used by Mr. Barba in a farm gardening service with which he earned part of his income) for the payment of his fees pursuant to the court order. Mr. Barba borrowed the money to purchase the equipment at the sale for $250, plus over $100 costs for towing, storage and expenses of the constable. He lost out on several jobs during the time he did not have his tools.

Mrs. Barba wrote letters to the disciplinary committee of the State Bar on July 18, July 29 and August 17, 1966, complaining about this fee situation and the hardship caused by the levy of execution. The third letter contained further allegations which led to the investigation and charges in this case. Basically they involve allegations that petitioner knew of an anticipated federal income tax refund of $562.99 as disclosed by the 1965 return filed by the Barbas shortly after he had agreed to represent Mrs. Barba; that he did not disclose this as part of the anticipated assets in the divorce matter; that he advised Mrs. Barba to sign her husband's name to the check when it arrived, to cash it, and not to tell anyone about it; that he advised her if she was questioned in court about it to deny that she knew anything about it or had received it; that he threatened her if she told anyone about this; that he had once shown her a gun in his office drawer and had stated he would not hesitate to use it on Mr. Barba if he ever came and said anything to him.

A Notice to Show Cause issued, charging that petitioner had violated sections 6103, 6067, 6068, Business and Professions Code (his oath and duties as an attorney), had wilfully violated rule 11, Rules of Professional Conduct (advising violations of law and not in good faith) and had committed acts involving moral turpitude (Bus. & Prof. Code, § 6106). Petitioner denied the charges. His answer admitted that he had represented Mrs. Barba in the divorce action, that order to show cause hearings were held, and that his client was asked by attorney Dunn if she received an income tax refund.

Local Administrative Committee No. 3 held hearings, the first on January 5, 1967, the second on April 4, 1968. Its original opinion, dated June

21, 1967, recommended public reproval. The disciplinary board, however, ordered the matter transferred to it for a hearing. On petitioner's request that newly discovered evidence be admitted or that he be given a trial de novo, the matter was transferred back to the local administrative committee for further hearing. Its report of July 23, 1968, recommended dismissal of the charges. The matter was reargued on the merits before the disciplinary board on October 18, 1969, and that board, by a vote of 9 to 3, adopted, with minor changes, the trial committee's original findings as to petitioner's culpability and recommended that he be suspended for six months on conditions of probation, including actual suspension for three months. The three dissenting members thought the proceeding should be dismissed. The situation as disclosed by the record is somewhat unusual and is therefore related in some detail. Petitioner appeared personally and by counsel at all hearings.

*First Trial Committee Hearing (January 5, 1967).*

Early in March 1966 Mrs. Cardoza, a bookkeeper, prepared a joint federal income tax return for 1965 for the Barbas showing a tax due of $483.79 and a claim for refund of $562.99. She testified that sometime around the beginning of March 1966 Mrs. Barba came by and picked up the original (unsigned) and a copy, that the "B" copy of the W-2 form was stapled to the original, that she could not recall the exact date but it was late in the afternoon; that she had offered Mrs. Barba a cup of coffee but the latter had declined, stating that she was in a hurry as she had an appointment with petitioner who had to have her tax returns.

Mrs. Barba testified that she first consulted petitioner about the 7th or 8th of March, 1966; that she saw him twice the first day, both times late in the afternoon. He asked questions about her husband's income and assets. She left his office to get the tax returns for him. It was late in the day but he agreed to wait. She went to Mrs. Cardoza's, returned with the original and a copy, gave them both to him. He returned the original to her.[1] Later she had her husband sign it and she mailed it.

She testified that petitioner asked her a lot of questions and made notes on long yellow sheets of paper. She brought him the $150 cash he demanded but did not get a receipt for it. Before she received the refund check she discussed this with petitioner many times, and he told her not to tell anyone about it, and if she was asked questions about it to answer

---

[1] In her deposition testimony Mrs. Barba testified that she had a copy of the tax return at home. During the hearing she testified that she had been mistaken in her deposition testimony and that she did not have a copy at home.

The June 21, 1967, opinion stated that she had thus satisfactorily explained the inconsistency and that her credibility was not thus impaired.

she never received it. He asked her if she had ever signed her husband's checks and she told him that she usually signed his salary checks and deposited them in their joint checking account. He told her to sign Mr. Barba's name to this check and to cash it, but not to say anything to her husband or to her husband's attorney, Dunn. She received the refund check on April 15, made payable to her and her husband jointly. She held it until May 11, being reluctant to cash it because "they" would know she would receive the refund within a certain amount of time, but she trusted petitioner as an attorney. On May 11, the day before the third hearing in the divorce matter, she endorsed her husband's name on the check and cashed it, depositing all but $50 of the proceeds in a new bank account in her name only. She gave the $50 to petitioner, in payment of a prior personal loan to her for which he was then demanding repayment. He knew she had no other money. She did not tell him what she did with the balance of the refund.

She was asked whether she could recall if she had testified in the divorce hearing on May 12 and whether she had been asked by anyone whether she had any money. She replied that attorney Dunn had asked her this question and that she had replied "No." None of the witnesses (petitioner or attorney Dunn) could remember whether during any of her testimony at the divorce hearings she had been questioned or had denied receiving the refund check. The committee found, for lack of evidence, that this charge was not true.

She testified that she reconciled with her husband about July 1, 1966, and told him what she had done with the refund check. She then telephoned petitioner, offering to pay him the $100 balance on his fee (the court had ordered Mr. Barba to pay petitioner $250) and requested a receipt from him for the $150 already paid. He demanded an additional $75. He told her that he would give her the receipt when she brought him the rest of the money, that she would have to pay the constable who was levying an execution of the judgment for petitioner's fees, and that there was nothing he could do about it.

She further testified that before the reconciliation she was in his office one day and he took a gun out of his drawer and showed it to her, saying he did not like Mr. Barba and that if he ever came and bothered him that he (petitioner) would not be afraid to shoot him (Mr. Barba) then and there. She also related that in a telephone conversation with him after the reconciliation he had threatened her that if she told about the income tax matter there would be "Two children who no longer had a mother." She did not know what he meant by that.

Petitioner denied that he ever received or saw the income tax return or that he had been told of the anticipated refund or of its receipt. He denied having advised Mrs. Barba not to tell her husband or attorney Dunn or the court about it, or having advised her to testify falsely. He indicated that during the divorce proceeding he was not interested in whether there was a tax obligation or a tax refund and that he never discussed these matters with her. He admitted that he asked her for the W-2 form as he wanted to know the couple's *income and assets.* He did not know how the photocopy of the W-2 form got in his file, or why it was so placed in the file as to be chronologically below the complaint (which might indicate it had been received before he filed the complaint, particularly in view of evidence that he always filed chronologically).[2]

He had no explanation for certain notations in his handwriting in his file. The third page from the bottom of the file contained a pencilled notation "depreciation schedule see for farm equipment." The divorce complaint and wife's affidavit prepared by him each contained a description of the farm equipment almost identical in sequence and wording as that set forth in the depreciation schedules of the Barba's tax return. Nowhere else in the file was there a list of the farm equipment. He could not recall where he had received the description of this equipment. He supposed that Mrs. Barba had brought it in. The complaint does not show any value for this equipment. The original wife's affidavit shows "value unknown." His copy of this affidavit shows, in his handwriting, values almost identical with those shown on the depreciation schedules which he claimed he never saw. Notations in his handwriting on yellow legal pad paper included one, apparently outlining questions to be asked at the second order to show cause hearing on April 11, 1966, reading "(9) Tax refund due . . . amount ($483.00). . . when"; another, apparently as part of litigation notes, reads "1965 total income (cf. Income Returns)"; another, apparently an outline of questions to ask, reads "Total 1965 income cf. income tax return."

He stated that he had no independent recollection of giving Mrs. Barba a receipt for the $150 cash. He had his secretary look through his receipt book and she discovered a carbon copy of a receipt that she had allegedly given to Mrs. Barba on March 8th. It was numbered 0092. The writing on the copy is double imaged, the date of the month is not clear, the receipt is out of order chronologically (the copy of the receipt before, 0091, and the seven receipts thereafter (0093-0103) bear dates prior to March 8th).

[2]Petitioner's secretaray testified that she had no independent recollection of where she got the original W-2; although she stated "Mrs. Barba must have brought it in." When asked "Do you recall her bringing in the W-2 form?" she replied, "No, I don't."

She also testified that she prepared the complaint and wife's affidavit from information dictated to her over the telephone by petitioner.

His secretary denied having filled in the receipt after commencement of the disciplinary proceedings, although she testified they usually used the next blank receipt in chronological order. She could not account for the double images on the receipt.

Petitioner also introduced a taped transcript of the conversation with Mrs. Barba in which she had said he had threatened her. He testified that it was his practice when taking a call on the phone to record it without his client's knowledge or consent. The transcript is admittedly not complete and ends in the middle of a sentence.

The committee concluded that there were some discrepancies in Mrs. Barba's testimony but that her credibility was not impaired. It concluded, moreover, that even without consideration of her testimony the evidence overwhelmingly proved that petitioner had possession of the Barba's income tax return prior to his preparation of the divorce complaint and that at all times he was aware of the existence of the claim for a tax refund and the amount thereof. It regretfully concluded that he had wilfully testified falsely. In the light of this they gave little credence to his denials that he had advised Mrs. Barba to cash the refund check and to keep still about it. Relevancy of the dates of phone calls to or from his client was considered. The committee concluded that he did not intend to harm Mrs. Barba by his threats or by his showing her the gun; that he had not shown good judgment or professional restraint in dealing with an inexperienced young client; but that his misconduct was motivated by aggressiveness. It found that the fees charged by him were reasonable, that his misconduct did not involve any quest for financial gain or other benefit, and that it was this uninhibited aggressiveness in collecting his fee from the couple that caused Mrs. Barba to complain to the State Bar. The committee stated that the offenses would not merit disbarment or suspension but that they were serious enough to preclude a private reprimand. Petitioner conditionally accepted their recommendation that he be given a public reproval. The Disciplinary Board rejected this conditional acceptance and on August 25, 1967, again ordered the case to be calendared before it. Petitioner again requested permission to present additional evidence.

The proffered evidence consisted of an affidavit signed by Mrs. Barba, dated September 12, 1967, prepared for her signature by attorney Dunn and notarized by him, in which she purported to recant in material respects her testimony at the first hearing. Petitioner's attorney also submitted an affidavit summarizing her "recanting" and attached a photocopy of a blank W-2 form. Counsel alleged in this affidavit that he had made this copy on petitioner's office machine and that it showed staple marks which were on

the original from which it was copied. He advanced the theory that since the photocopy of the W-2 form in petitioner's file did not show staple marks, and since it was made from the original "B" copy, that it must have been made from that copy *before* it was delivered to Mrs. Cardoza and *before* she prepared the tax return. No supporting evidence was offered at the second hearing regarding the process by which his photocopy of the W-2 form had been made nor physical evidence to support his theory that staple marks will always show on a photocopy.

*Second Trial Committee Hearing (April 4, 1968).*

Only Mrs. Barba and attorney Dunn testified. Before the trial committee's first hearing on January 5, 1967, the Barbas were still reconciled. Sometime thereafter they again separated. Prior to June 1967 they consulted attorney Dunn, both requesting him to represent Mrs. Barba in an uncontested divorce. He agreed to represent her after being assured that the divorce was uncontested and after receiving written consents from Mr. Barba and from petitioner. Two affidavits were prepared by Dunn for her signature, one dated July 24, the second September 12, 1967. Mrs. Barba testified that they were prepared without her knowledge, that she signed them both in his office on the same day in early September, 1967, that she signed them after Dunn told her that ". . . Unless I signed . . . I could absolutely not have a divorce; that it would mess me up in court, and that I had to sign. . . . This was to get me off the hook. . . ." She testified that portions of the declarations that repudiated her earlier testimony were not true, and that her testimony at the first trial was accurate. In the affidavit Mrs. Barba stated: "I am confident that [petitioner] was not aware of any income tax refund check of mine." At the hearing she explained that she knew this declaration was false but that she signed it because Dunn told her that unless she signed it she could not get a divorce; that nothing had come from this case (disciplinary proceeding), and that she was supposed to apologize for all the trouble that was caused. At the hearing she denied that she had told Dunn that she had falsely testified against petitioner, and she insisted that she had never talked to him about this until September 12 when he showed her the affidavits he had prepared for her to sign. Another statement in the affidavit was "I clearly recall that I had a copy of my 1965 I.R.S. return at my home, and I believe that I took it to the office of my attorney, but I do not recall giving it to my attorney himself, and I may have left it with his secretary." She was not given a copy of either affidavit. After the affidavits were signed, Dunn went ahead and obtained the interlocutory decree of divorce for her.

The record also shows that petitioner and Dunn were in frequent contact with each other before Mrs. Barba signed these affidavits. The documentary evidence also shows that shortly after petitioner was given notice

of an adverse State Bar action [i.e., the trial committee's first report finding petitioner culpable (July 14, 1967) and the disciplinary board's action rejecting petitioner's conditional acceptance (September 1, 1967)] and just before the dates of Mrs. Barba's affidavits, Dunn received numerous calls from petitioner or his counsel. The interlocutory decree was filed September 19, 1967. On September 21, 1967, petitioner filed to reopen the disciplinary proceedings to present new evidence, primarily the recanting of Mrs. Barba's testimony at the first hearing, as evidenced by the affidavit of September 12, 1967.

Dunn testified that Mrs. Barba told him she wanted to ease her conscience because of the testimony she had given at the first hearing, that he decided to prepare an affidavit for this purpose, that he called petitioner's counsel and offered to send him a copy of the affidavit, and that he did this without advising his client of his action or obtaining her express consent. Mrs. Barba was still not satisfied, he said, so he then prepared a second more detailed affidavit, and that after she signed it "she appeared relaxed and happy for the first time since he represented her." He did not advise his client or get her consent to his sending petitioner's attorney a copy of this second affidavit. Dunn kept no notes of his conversations with Mrs. Barba. Mrs. Barba denied telling him she felt badly about her testimony or that she wanted to set matters right and she denied Dunn's account of her emotional condition.

In recommending dismissal of the charges, the committee stated: "The probability of truth lies with the testimony of Janice Barba respecting the making of the declaration. *It would overtax the credulity of any practicing attorney to accept the testimony of attorney Ernest W. Dunn in respect to the circumstances leading to the making of the declaration.* The story was interesting and novel, but was not accepted by the committee.

*"Moreover, the committee believes that the probability of truth lies with the Findings previously filed by the committee which were based upon the earlier testimony of Mrs. Barba.* Nevertheless, by executing the Declaration of September 12, 1967, Janice Barba demonstrated her willingness to make a false statement. . . . The committee therefore concludes that the testimony of Janice Barba cannot be afforded such weight that would constitute 'clear and convincing proof' of the previous Findings of the committee, nor of the charges against [Petitioner]."

The committee also denied petitioner's application, made after the second trial committee hearing, to set aside order of submission and for permission to present further evidence. This was based on alleged newly discovered evidence, which consisted of affidavits of third persons, directed to impeachment of Mrs. Barba's testimony on an extraneous matter, i.e.,

the date when she reconciled for a second time with her husband after the interlocutory judgment was entered.

On October 18, 1968, counsel reargued the matter on the merits before the disciplinary board. Petitioner did not renew his application to set aside the order of submission and to present further evidence. He contends that the local committee's denial of his application to reopen was proper only because that committee, at the same time, made its findings and recommendations exonerating petitioner, and that when the disciplinary board later rejected such findings and recommendation, and substituted contrary findings and a contrary recommendation, that denial of a further hearing was an abuse of discretion.

■ Review in this court is sought on the grounds that the findings of the disciplinary board are not supported by the evidence; that the recommendation is against law; and that denial of petitioner's application to reopen for further hearing constituted an abuse of discretion.

■ This court passes upon the sufficiency and weight of the evidence. It is not bound by findings of fact of the local administrative committee or the disciplinary board. Great weight is given, however, to the findings of the committee as to credibility of witnesses and evaluation of conflicting statements, particularly where the findings of the committee and the disciplinary board are in conflict. Under such circumstances this court is ordinarily reluctant to reverse the committee's decision. (*Medoff* v. *State Bar* (1969) 71 Cal.2d 535, 546 [78 Cal.Rptr. 696, 455 P.2d 800].)

■ The situation presented here is most unusual. It is significant that at its second hearing the local administrative committee stated that it believed "the probability of truth lies with the findings previously filed by the committee which were based upon the earlier testimony of Mrs. Barba." The findings previously filed clearly stated that the committee was forced to conclude from the evidence before it, "even without consideration of the testimony of Janice Barba," that petitioner had possession of the tax return prior to the preparation of the divorce complaint and was at all times aware of the existence of the claim for a tax refund and the amount thereof, and, therefore, that he had *testified falsely before the Committee* when he unequivocally denied ever having possession of the return or having awareness of the possible refund. At the second hearing the local administrative committee did not reject Mrs. Barba's explanation of the circumstances under which the affidavits in which she "recanted" were prepared and it expressly found that the explanation given by attorney Dunn would "overtax the credulity of any practicing attorney." Petitioner did not testify.

From a consideration of all the evidence this court has determined that, even without consideration of the testimony of Mrs. Barba, petitioner testified falsely before the committee when he unequivocally denied ever having possession of the return or having awareness or interest in the possible refund. It is difficult to believe his assertion that he requested a copy of the W-2 form in order to learn the Barba's income and assets and that he had no interest at that time in the income tax return. He would not get this information from the W-2 form alone. As an experienced attorney he must have appreciated the importance of the tax return. It is an important source of information concerning the financial status of the spouses, their sources of income, interest earned on bank accounts, assets being depreciated, possible tax liability or entitlement to a tax refund, and community assets to be divided. The divorce proceedings were commenced at a time when tax returns were required to be filed and were necessarily of interest in this particular matter. The evidence heretofore discussed indicates that petitioner had knowledge of the existence of the return and of its contents.

The evidence was in conflict as to when he received this information. There was evidence that he customarily filed his files chronologically. His photocopy of the "B" W-2 form was filed below his copy of the complaint and wife's affidavit. Mrs. Cardoza testified that she could not remember the exact date when she prepared the tax return but that it was her custom to prepare them early, that she thought she prepared this one early in March, and that she remembered giving it to Mrs. Barba with the "B" copy of the W-2 form attached one afternoon when Mrs. Barba told her she needed it for her attorney in the divorce matter. Mrs. Barba's first consultation was with petitioner on March 8; the complaint was filed March 11; and she cashed the refund check May 11. Despite petitioner's copious file notes and messages from his secretary, there was nothing in his file to indicate where he obtained the information contained in the complaint and wife's affidavit which itemized the farm property almost precisely as listed in the depreciation schedule in the income tax return, and the valuations noted on his copy of wife's affidavit were exactly the same as those on the schedule.

After the first trial committee hearing and report petitioner requested a second hearing, one ground being that he wanted to produce newly discovered evidence regarding the lack of staple marks on his W-2 photocopy. The hearing was granted but he submitted no evidence at all on this issue. His counsel did refer to it in his closing argument as if it had some basis in the record. There was none. No opportunity was given to the State Bar for cross-examination or refutation. He now asks this court to take judicial notice of the fact that when a document having staple holes in it

is duplicated on a copying machine, the copy will disclose some evidence of such holes.

Judicial notice may not be taken of any matter unless authorized or required by law. (Evid. Code, § 452.) ■ This court is compelled to take judicial notice only of facts and propositions of generalized knowledge that are so universally known that they cannot reasonably be the subject of dispute. (Evid. Code, § 451.) If there is any doubt whatever either as to the fact itself or as to its being a matter of common knowledge, evidence should be required. (*Varcoe* v. *Lee,* 180 Cal. 338, 345 [181 P. 223].)

■ This court may take judicial notice that there are many kinds of copying machines utilizing different processes. In the absence of evidence it may not take judicial notice that a particular photostat was made from an unstapled original. It is noted that petitioner's secretary indicated that there were two copy machines in his office, each using different processes, and that she only "believed" that she must have made the copy found in his file on one of the machines from the original. It could have been a copy of a copy and thus further removed from the original. It could have had the staples affixed through some of the printing or through the circles on the right-hand edge of the W-2 form, or there could be other reasons why there are no apparent staple marks on his photocopy. No evidence was introduced as to the process by which either photostat was made. Speculation does not take the place of evidence.

■ An attorney is under a duty to present to the local administrative committee and to the board any evidence which he deems is favorable to himself. He may not neglect to do this and then demand in his petition for review either that such evidence be considered by this court or that he be given another hearing before the State Bar. (*Coviello* v. *State Bar* (1955) 45 Cal.2d 57, 65 [286 P.2d 357].) ■ He failed to produce evidence on this point after requesting and receiving a rehearing. He cannot be heard to complain now.

■ After the second disciplinary hearing petitioner again requested that the proceedings be reopened to produce additional evidence, namely that Mrs. Barba testified falsely at the second hearing when she stated that she was not then reconciled with her husband. Petitioner did not renew his offer to produce this evidence or motion to reopen before the disciplinary board. As an attorney he knew that the board has the right and duty to exercise an independent judgment on the record. He gave the board no opportunity to consider this matter, apparently relying upon their adoption of the committee's recommendation for dismissal. No showing is

made that a different result would be probable on retrial if this further evidence had been received and considered by the disciplinary board.

*Questions:* First. *Does the evidence sustain a finding of culpability for which discipline should be imposed?*

*Yes.* Knowingly giving false testimony on a material factual issue is a serious breach of basic standards of honesty as well as a violation of an attorney's oath of office and his duties as an attorney. Affirmative representations made with intent to deceive, even though no harm results, are grounds for discipline. (*Scofield* v. *State Bar* (1965) 62 Cal.2d 624, 628 [43 Cal.Rptr. 825, 401 P.2d 217].) Testimony given by an attorney before a disciplinary committee is given under oath or affirmation that he will speak truthfully. Falsely testifying in such proceeding is not only perjury but is a violation of the duty of honesty and integrity imposed upon him as an attorney at law. It is the duty of an attorney to employ, for the purpose of maintaining the causes confided to him such means only as are consistent with truth, and never to seek to mislead the judge or any judicial officer by an artifice or false statement of fact or law. (Bus. & Prof. Code, § 6068, subd.(d).) The same duty of honesty and not seeking to mislead applies to disciplinary hearings conducted by the State Bar of California.

Second. *What should the discipline be under the circumstances?*

Petitioner's conduct was reprehensible and he should be disciplined therefor. This court has noted the evidence going to the impeachment of Mrs. Barba's testimony, however, as well as the mitigating factors noted by the local administrative committee in its original report. From a consideration of all the circumstances it would appear that a public reprimand would be sufficient punishment to petitioner to insure that in the future he will adhere to the rules and principles that are binding upon all members of the bar. This opinion will serve as such public reprimand.