[L.A. No. 31006. Apr. 30, 1979.]

BORIS J. BARANOWSKI, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

**COUNSEL**

Cohen, Stokke, Owen & Davis and Mitchell Samuelson for Petitioner.

Herbert M. Rosenthal and Marie M. Moffat for Respondent.

**OPINION**

**THE COURT.**\*—This is a proceeding to review a recommendation of the Disciplinary Board of the State Bar (Disciplinary Board) that the

---

\*Before Tobriner, Acting C. J., Mosk, J., Clark, J., Richardson, J., Manuel, J., Newman, J., and Puglia, J.†

---

†Assigned by the Acting Chairperson of the Judicial Council.

petitioner be suspended from the practice of law for one year on conditions of probation, including actual suspension of six months. Petitioner was admitted to practice law in California in 1962 and has no prior disciplinary record.

Petitioner is charged with violating his oath and duties as an attorney (Bus. & Prof. Code, §§ 6067, 6068), with acts involving moral turpitude and dishonesty (Bus. & Prof. Code, § 6106) and with failing to place advance fee payments from clients in an identified and labelled "Trust Account" (Rules of Prof. Conduct, rule 8-101).

FACTS:

The charges arise out of the petitioner's dealings with three different clients. These matters were consolidated for hearing before the Disciplinary Board. The root of his problem, however, appears to have been a $480,000 debt for back taxes which petitioner owed to the Internal Revenue Service (I.R.S.). The liability for the back taxes arose in 1969 as a result of petitioner's ownership of an engineering business, and resulted in a major tax lien against petitioner's earnings. In 1974, petitioner began to consider the possibility of declaring himself bankrupt. In 1976, he filed a voluntary bankruptcy petition which listed, in addition to the I.R.S. claim, a $25,000 debt for back taxes owing to the State of California and unsecured creditors' claims in the total amount of $251,126.54.[1] Included in this last figure were amounts paid by petitioner's clients as advance fee payments for which services had never been rendered by petitioner and which petitioner considered morally and legally "refundable." These payments form the basis of most of the charges against petitioner.

*The Labosky Matter*

The basic facts in this matter are not in dispute. In 1975, Mr. Phillip Labosky, doing business as a construction subcontractor, sought petitioner's advice about some problems he was having with a general contractor and a carpenters' union. During the course of their first meeting, petitioner informed Labosky that he had a "good case" for breach of contract. This analysis of the merits rested on Labosky's rather brief recitation of the events in question and on the fact that petitioner had previously prevailed over the attorney who was currently representing the general contractor. Petitioner's advice involved no independent inquiry or research. Petitioner also indicated to Labosky that a letter from the carpenters' union to its members afforded grounds for a "perfect libel suit" worth "twenty thousand dollars."

---

[1] Petitioner listed his total assets at the time as $5,050.

On the basis of these representations, Labosky agreed to pay petitioner a $5,000 fee to handle the case. The payments were made in a series of installments over a two-week period. Labosky testified that petitioner at no time contacted him to discuss the merits of the case. Petitioner did attend a meeting with the general contractor and his attorney sometime in early November. It was at this time, petitioner testified, that he determined that the chances of Labosky prevailing in a lawsuit were "less than desirable." At no time, however, did petitioner inform his client of his change in outlook. To the contrary, Labosky was not even able to contact petitioner; his numerous phone calls were never returned; he also made an appointment which petitioner failed to keep.

In February 1976, Labosky contacted another attorney, John Ball, about his problem. Ball investigated the matter and informed Labosky that his case against the general contractor was dubious; Ball, however, agreed to contact petitioner about a refund of the $5,000 fee. Although there is some question as to how much work was actually performed, petitioner admitted that the fee was not earned when received and that a substantial portion was owing to Labosky. Ball later represented Labosky in an action in Santa Clara County Superior Court and obtained a default judgment against petitioner. The $5,000 fee was not repaid until a week before the disciplinary hearing. Petitioner admits having spent the $5,000 "shortly after [he] received it" and does not dispute the fact that he failed to keep any time accounting records and failed to place any of the $5,000 fee in an identified and labelled trust account.

As a result of his dealings with Mr. Labosky, the Disciplinary Board hearing panel found that petitioner's advice to his client concerning the merits of his claim, as well as his failure to apprise his client of his change in attitude, constituted a reckless inducement to entertain a legal action in violation of his responsibility to discharge his duties as an attorney at law to the best of his knowledge and ability (Bus. & Prof. Code, § 6067) and of his obligation to counsel only such actions as appear to him legal or just. (Bus. & Prof. Code, § 6068.) The panel also concluded that such actions constituted "acts involving moral turpitude" in violation of Business and Professions Code section 6106. In addition, the panel determined that the petitioner's failure to place the $5,000 fee in an identifiable trust account violated rule 8-101 of the Rules of Professional Conduct of the State Bar.

*The Potsdawny Matter*

The facts in this matter are also not in dispute. On March 25, 1975, Adam Potsdawny contacted petitioner about drawing up a will. At that

time, petitioner advised Potsdawny that he should incorporate his sole proprietorship because of certain "tax advantages." Potsdawny accepted petitioner's advice and paid him a $900 fee. Shortly thereafter, Potsdawny consulted his tax counselor who informed him that he knew of no tax advantages and advised him not to incorporate. Potsdawny immediately contacted petitioner and told him to stop the incorporation.

Petitioner testified that he considered the $900 fee at all times "to be a refundable fee." Nevertheless, he failed to place the money in an identifiable trust account, choosing instead to cash the check. Petitioner informed Potsdawny that he was financially unable to refund the $900 and did not refund the money until one week prior to the disciplinary hearing.

As a result of his transaction with Mr. Potsdawny, the Disciplinary Board hearing panel found that the petitioner's failure to place the $900 fee in an identifiable trust account constituted a violation of rule 8-101 of the Rules of Professional Conduct of the State Bar of California.

*The Brown Matter*

In January 1973, Eleanor Brown retained petitioner to represent her in a dispute over a marital settlement agreement with her ex-husband. He also agreed to prepare a will for her. The total fee paid by Mrs. Brown for these services was $450. There is considerable dispute between petitioner and his client over what services, if any, petitioner performed in conjunction with this fee. Petitioner claims that the entire $450 was earned. As with the previous cases, petitioner failed to maintain any time accounting records to support his assertions.[2]

The substance of respondent State Bar's argument in this matter, however, concerns a loan which petitioner induced his client to make to him. In June 1973, petitioner approached Mrs. Brown about the possibility of her making him a $2,000 loan at 10 percent interest, payable at $200 per month for 11 months. He indicated that he needed the money to pay his staff since he was currently working on an important case pro

---

[2]The Disciplinary Board found that although the petitioner did perform some services in connection with the $450 fee paid by Mrs. Brown, neither the preparation of the will nor the services in connection with the settlement agreement dispute were ever completed. In reference to its conclusion, however, that petitioner had violated two sections of the Business and Professions Code in this matter, the board seemed to ignore the question of the petitioner's failure to complete all the work promised, focusing instead exclusively on petitioner's conduct in securing a loan from Mrs. Brown.

bono. After he had properly made the first two payments, Mrs. Brown offered to lend him another $1,000 on the same terms, an offer which petitioner accepted. Subsequent to the second loan, although Mrs. Brown repeatedly asked for her money back, petitioner made no further payments to her until one week prior to the disciplinary hearing. At no time, however, did petitioner indicate to his client that he was unable to repay the loan.

There is a dispute between petitioner and Mrs. Brown as to how much she knew about his financial condition. He claims that she was aware of the I.R.S. tax lien. She testified that she did not learn of the extent of petitioner's difficulties until after he filed for bankruptcy. A witness at the hearing testified that petitioner had told Mrs. Brown that he was having "some difficulty in meeting his obligations as they came through." It is clear from the record, however, that petitioner refused to fill out a standard bank loan form listing assets and liabilities when requested to do so by Mrs. Brown and that he failed to fully explain to her the various means and methods of making loans or discuss with her terms of loans which are favorable to lenders.

As a result of his involvement with Mrs. Brown, the Disciplinary Board hearing panel found that petitioner's failure to disclose to his client the full extent and nature of his financial condition constituted a violation of his obligation to discharge the duties of an attorney at law to the best of his ability (Bus. & Prof. Code, § 6067) as well as an act involving moral turpitude. (Bus. & Prof. Code, § 6106.)

LEGAL ISSUES:

Petitioner's contentions in this hearing fall into three general categories. He first argues that the findings of the hearing panel in the three matters are not supported by the evidence. Secondly, he contends that several procedural errors committed by the respondent denied him his right to a fair hearing. He finally urges that the findings of the hearing panel do not justify the severity of the disciplinary action imposed. We turn first to the petitioner's contention that the evidence does not support the hearing panel's findings.

*Substantial Evidence Questions*

We have often reiterated the principle that the petitioner has the burden of showing that the findings of the Disciplinary Board are not supported by the evidence. (*Schullman* v. *State Bar* (1976) 16 Cal.3d 631,

634 [128 Cal.Rptr. 671, 547 P.2d 447]; *Geffen* v. *State Bar* (1975) 14 Cal.3d 843, 852 [122 Cal.Rptr. 865, 537 P.2d 1225].)

Most of petitioner's attack on the findings of the Disciplinary Board amounts to an assertion that the board should have believed him and not believed his former clients. ■ ˙ While this court does not take lightly its duty to independently examine the evidence (*Glickman* v. *State Bar* (1973) 9 Cal.3d 179, 184 [107 Cal.Rptr. 65, 507 P.2d 593]), we have often noted that we are reluctant to disturb the findings of the Disciplinary Board if they are based largely on testimonial evidence. (*Goldman* v. *State Bar* (1977) 20 Cal.3d 130, 139 [141 Cal.Rptr. 447, 570 P.2d 463]; *Nizinski* v. *State Bar* (1975) 14 Cal.3d 587, 595-596 [121 Cal.Rptr. 824, 536 P.2d 72].) This position rests upon the fact that the board has the opportunity to observe first-hand the demeanor of the witnesses and can better evaluate the veracity of their testimony. (*Himmel* v. *State Bar* (1971) 4 Cal.3d 786, 794 [94 Cal.Rptr. 825, 484 P.2d 993].)

■ The record supports the board's finding that the petitioner violated several sections of the Business and Professions Code relating to his oath and duties as an attorney (§§ 6067 and 6068) and the commission of acts involving moral turpitude (§ 6106). With respect to his client Mr. Labosky, petitioner's rather overzealous assessment of the merits of Labosky's case, reached without the benefit of any independent investigation, is highly suspect. His subsequent failure to inform his client when he changed his opinion of the case, compounded by his failure to even meet with his client, demonstrates gross carelessness and negligence and justifies disciplinary action. (*Jackson* v. *State Bar* (1979) 23 Cal.3d 509, 513 [153 Cal.Rptr. 24, 591 P.2d 47]; *Simmons* v. *State Bar* (1970) 2 Cal.3d 719, 729 [87 Cal.Rptr. 368, 470 P.2d 352].)

˙With respect to the *Brown* matter, petitioner's conduct was even more questionable. ■ In past cases, we have repeatedly warned of the immense danger involved when an attorney places himself in a position in which his business interests are adverse to those of his client. (*Marlowe* v. *State Bar* (1965) 63 Cal.2d 304, 308 [46 Cal.Rptr. 326, 405 P.2d 150]; *Magee* v. *State Bar* (1962) 58 Cal.2d 423, 430 [24 Cal.Rptr. 839, 374 P.2d 807].) Such a situation inherently jeopardizes the fiduciary relationship between attorney and client and requires that the attorney bear the heavy burden of proving that the dealings were fair. ■ Petitioner failed to carry that burden here. In order to absolve himself, petitioner would have been compelled to show that he would have advised Mrs. Brown in good faith to make the loan even if he himself had not been the recipient. His inability to make such a showing, coupled with his failure to fill out a

form listing his assets and liabilities when requested to do so by Mrs. Brown and his failure to explain to Mrs. Brown other less dangerous and more profitable ways of investing her money, clearly support the findings of the Disciplinary Board.

The asserted violations of rule 8-101[3] as to Labosky and Potsdawny pose an interesting and novel issue. There is no dispute as to the fact that petitioner received an advance fee payment of $5,000 from Labosky and $900 from Potsdawny. There is also no dispute as to the fact that at least a substantial portion of these advance fees were never earned or that petitioner failed to repay them until one week prior to the disciplinary hearing. The only question is whether or not rule 8-101 required the petitioner to deposit such funds in an identifiable trust account.

Rule 8-101 expressly requires that sums advanced to pay costs or expenses be placed in a separate trust account; it does not expressly deal with advance legal fees. Thus the present case poses two issues: Whether any portion of the monies advanced by Labosky and Potsdawny were for costs or expenses, and, if not, whether rule 8-101 nevertheless requires that unearned fees be placed in a separate trust account.

■ The Disciplinary Board made a specific finding that the advance fee payments from clients Labosky and Potsdawny included advances for costs and expenses. Petitioner, however, correctly challenges the finding of the Board as unsupported by the evidence. When petitioner cashed the $900 Potsdawny check, he secured a cashier's check for $36 to cover the cost of a corporation kit. There is no evidence in the record as to whether any part of the additional $864 was intended in part as an advance for additional costs and expenses or, as petitioner claims, was entirely an advance fee. With respect to the $5,000 Labosky fee, there is no evidence in the record to indicate whether or not any of it was intended to cover

---

[3]Rule 8-101 provides in relevant part as follows:

"(A) All funds received or held for the benefit of clients by a member of the State Bar or firm of which he is a member, including advances for costs and expenses, shall be deposited in one or more identifiable bank accounts labelled 'Trust Account,' 'Client's Funds Account' or words of similar import, . . . and no funds belonging to the member of the State Bar or firm of which he is a member shall be deposited therein or otherwise commingled therewith except as follows:

" . . . . . . . . . . . . . . .

"(2) Funds belonging in part to a client and in part presently or potentially to the member of the State Bar or firm of which he is a member must be deposited therein and the portion belonging to the member of the State Bar or firm of which he is a member must be withdrawn at the earliest reasonable time after the member's interest in that portion becomes fixed. However, when the right of the member of the State Bar or firm of which he is a member to receive a portion of trust funds is disputed by the client, the disputed portion shall not be withdrawn until the dispute is finally resolved. . . ."

costs and expenses. Thus, if the invocation of rule 8-101 depends on the distinction between money for costs and money for fees, it is reasonable to conclude that the State Bar has failed to sustain its burden of proof in the matter.

The novel aspect of the issue is the seemingly implicit contention of the respondent State Bar that the issue of costs and expenses is irrelevant. Its argument would appear to be that any advance fee payment must be deposited in an identifiable trust account until such time as it is earned. We need not, however, resolve the question of whether or not an advance fee payment is correctly characterized as money "received or held for the benefit of clients" within the meaning of rule 8-101[4] since petitioner's violation of the various sections of the Business and Professions Code fully warrants the Disciplinary Board's recommendation of a six-month actual suspension.

### Procedural Questions.

Petitioner raises three procedural arguments, alleging that certain errors committed by the respondent State Bar denied him his opportunity for a fair hearing. All three contentions are without merit.

■ The Disciplinary Board hearing panel which heard petitioner's case was composed of two referees. A third referee had been appointed but could not attend the hearing due to illness and did not participate in the panel's decision. Petitioner contends that the absence of the third member of the panel deprived him of his rights under rule 20.10 of the Rules of Procedure of the State Bar of California.[5]

---

[4]An "advance fee payment" as used in this context is to be distinguished from a classic "retainer fee" arrangement. A retainer is a sum of money paid by a client to secure an attorney's availability over a given period of time. Thus, such a fee is earned by the attorney when paid since the attorney is entitled to the money regardless of whether he actually performs any services for the client. The respondent's argument concerning the applicability of rule 8-101 is intended to cover only advance fees paid for the performance of a particular legal service (e.g., the incorporation of a business or the preparation of a will). In those instances, respondent asserts that the fee is not earned until the service is actually performed. Thus, the State Bar argues that the advance fee payments are funds held by an attorney in trust "for the benefit of clients" within the meaning of rule 8-101.

[5]Rule 20.10 provides that "[e]xcept as provided in Rule 20.20 [inapplicable], a hearing panel is composed of three disciplinary referees, not more than two of whom may be disciplinary referees pro tem."

We first point out that petitioner failed to tender any objection when the chairman of the hearing panel announced at the outset of the hearing that the third member of the panel would not be participating. Secondly, petitioner fails to note that rule 73.10 provides that a quorum for a hearing panel consists of a majority of the members of that panel. Finally, a prior decision of this court has ruled that participation by two members of a three-member panel constitutes a valid hearing for the purposes of disciplinary action against a member of the bar. (*Petersen* v. *State Bar* (1943) 21 Cal.2d 866, 870-871 [136 P.2d 561].) Petitioner would distinguish *Petersen* on the grounds that the referee in that case permanently "retired" from the local committee because of disqualification whereas the referee in this case was only temporarily incapacitated because of illness. Such a distinction is without a difference. Both referees were absent for the entire proceeding and did not in any way participate in the decision-making process. We hold, therefore, that the absence of the third panel member did not deprive petitioner of his right to a fair hearing.

Petitioner's second contention is that he was improperly denied advisory review by the State Bar pursuant to rule 22.10. That rule requires that the State Bar grant an advisory review if the member under investigation files a written request within 15 days after service of the proposed decision. Petitioner was served with a copy of the proposed decision on or about November 28, 1977. Accompanying the decision was a cover letter informing the petitioner of the 15-day limit within which he was required to file a request for an advisory review. Petitioner did not file such a request until February 23, 1978, over two months after the deadline had passed and nearly one month after the Disciplinary Board had entered its final decision. Petitioner offered no explanation for the delay. Under such circumstances, the administrative denial by the State Bar of the petitioner's request does not constitute an abuse of discretion.

Petitioner's third contention is that he was improperly denied a hearing de novo and leave to present further evidence. He claims that he was surprised by the rapid termination of the hearing and that he subsequently discovered additional evidence which he felt should be presented. The claim of surprise is unsupported by the record. The reporter's transcript of the hearing makes clear that the petitioner had no intention of presenting additional evidence and was well aware that the evidentiary phase of the hearing had been completed.

Petitioner's claim of discovery of additional evidence did not warrant a hearing de novo. The evidence which he seeks to present is of the same

general type as that which he presented at the hearing. Much of it would appear to be irrelevant. He gives us no explanation as to why this evidence was not known and available to him at the time of the original hearing. In the absence of such an explanation and in view of the clear evidence in the record refuting the claim of surprise, we cannot say that the denial of petitioner's request was improper. (*Barreiro* v. *State Bar* (1970) 2 Cal.3d 912, 925 [88 Cal.Rptr. 192, 471 P.2d 992]; *Coviello* v. *State Bar* (1955) 45 Cal.2d 57, 65 [286 P.2d 357].)

### Severity of the Disciplinary Action

Petitioner contends that the six-month actual suspension is an excessive punishment in view of the circumstances. He argues that his precarious financial position during the incidents coupled with his subsequent repayment of the amounts owed should be looked upon by this court as mitigating factors. We must disagree.

As we pointed out above, the fact that petitioner during this period encountered serious financial difficulties indicates that he should have been *more,* not less careful with the handling of his clients' funds.[6] His subsequent repayment of the monies, standing alone, might be a mitigating factor. But the fact that they were repaid only a week before the disciplinary hearing detracts from the petitioner's plea.

We find the Disciplinary Board's recommendation appropriate. It is therefore ordered that the petitioner be suspended from the practice of law for one year on conditions of probation, including an actual suspension of six months. In addition, petitioner must pass the Professional Responsibility Examination within one year (see *Segretti* v. *State Bar* (1976) 15 Cal.3d 878, 891, fn. 8 [126 Cal.Rptr. 793, 544 P.2d 929]) and comply with California Rules of Court, rule 955 within thirty days after the effective date of this order.

---

[6]Although it does not form the basis for our decision, we note the strong suggestion in this case that petitioner's overzealous evaluation of Mr. Labosky's case which we found to involve gross carelessness (see p. 162, *ante*), may have been motivated by his desire to obtain a sizeable advance fee payment in order to salvage his own deteriorating financial position. That petitioner knew or should have known that few if any services would actually be performed in the case, coupled with petitioner's admitted knowledge that his own insolvent condition made repayment of any refundable fees unlikely if not impossible, makes petitioner's conduct even more difficult to condone.