77 F.3d 1201
 Fed. Sec. L. Rep. P 99,048, 96 Cal. Daily Op. Serv. 1657,
96 Daily Journal D.A.R. 2812
SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellant,
v.
INTERLINK DATA NETWORK OF LOS ANGELES, INC.; Interlink
Fiber Optic Partners L.P.; Interlink Video Phone
Partners L.P.; Michael Gartner,
Defendants-Appellees.
 No. 94-56173.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 8, 1996.
Decided March 11, 1996.
 
 Paul Gonson, Solicitor, Washington, D.C., Christopher Paik, Senior Counsel, Securities and Exchange Commission, Washington, D.C., for plaintiff-appellant.
 Robert K. Wrede and Sue Ellen Smyle, Lewis, D'Amato, Brisbois & Bisgaard, Los Angeles, California, for defendants-appellees.
 Appeal from the United States District Court for the Central District of California Manuel L. Real, District Judge, Presiding, D.C. No. CV-93-03073-R.
 Before: POOLE, WIGGINS, and RYMER, Circuit Judges.
 WIGGINS, Circuit Judge:
 
 
 1
 The Securities and Exchange Commission ("SEC") brought this civil enforcement action against several defendants, including Interlink Data Network of Los Angeles, alleging securities fraud involving the sale of unregistered securities. In the early stages of the litigation, the SEC obtained a temporary restraining order and preliminary injunction that, inter alia, froze the defendants' assets. Ultimately, the SEC obtained a judgment against Interlink requiring, in relevant part, the disgorgement of over $12 million (representing the funds of defrauded investors) and the deposit of Interlink's assets in the court registry for disbursement.
 
 
 2
 After entry of the judgment, the district court determined that certain funds paid in advance by Interlink to its attorneys, Lewis, D'Amato, Brisbois & Bisgaard, were earned by Lewis, D'Amato upon payment. Thus, the court concluded that the funds were not encompassed by the asset freeze in the temporary restraining order or the preliminary injunction and therefore need not be deposited in the court registry for disbursement pursuant to the judgment against Interlink. The SEC appeals this order of the district court. We have jurisdiction under 28 U.S.C. § 1291 and, for the following reasons, we REVERSE and REMAND.
 
 I.
 
 3
 On May 27, 1993, the SEC filed a civil action against several defendants, including Interlink, alleging securities fraud involving the sale of unregistered securities. The same day, the district court entered a temporary restraining order, which, inter alia, froze the assets of the defendants. The TRO provided in relevant part:
 
 
 4
 Any financial or brokerage institution or other person or entity holding any funds or other assets in the name, for the benefit or under the control of the Defendants, or their subsidiaries, and which receives actual notice of this order by personal service, telecopy, telephone, or otherwise, shall hold and retain within its control and prohibit the withdrawal, removal, transfer or other disposal of any such funds or other assets.
 
 
 5
 On June 7, 1993, the district court filed a preliminary injunction containing identical language; moreover, the preliminary injunction stated that the asset freeze provisions could be modified "to provide Defendant Gartner with reasonable living expenses upon an application to the Court." No provision was made for attorney's fees.[1]
 
 
 6
 Prior to the entry of the TRO asset freeze, Interlink had made payments totalling $45,000 to Lewis, D'Amato. In addition, on the day the TRO was entered, Interlink paid Lewis, D'Amato $25,000 in the form of a cashier's check.[2] It is undisputed that, at the time the asset freeze was entered, Lewis, D'Amato had performed services totalling $28,177; thus Lewis, D'Amato had received $41,823 for services not yet rendered.
 
 
 7
 On July 19, 1993, Lewis, D'Amato on behalf of Interlink filed a motion asking the court (1) to clarify that the freeze order did not prevent defendants from utilizing their funds to pay attorneys; (2) to permit defendants to utilize their funds to pay attorney's fees; or (3) to permit withdrawal of counsel. The court orally denied that motion on August 2, 1993; the court also informed counsel that in order to withdraw Lewis, D'Amato would have to bring a separate motion.
 
 
 8
 Lewis, D'Amato, however, did not renew its motion to withdraw. On November 16, 1993, judgment was entered against Interlink, requiring, in relevant part, that Interlink disgorge over $12 million representing the funds of defrauded investors. The judgment also required
 
 
 9
 that all liquid assets (such as cash, certificates of deposit, money market funds, and securities) in the name of, for the benefit of, or under the control of InterLink (including signatory authority) be immediately turned over to the registry of the Court-regardless of who has them-where they shall be held pending final distribution.
 
 
 10
 Pursuant to the judgment, the SEC requested that Lewis, D'Amato deposit the $41,823.05 in the court's registry. After several months, on April 12, 1994, Lewis, D'Amato did so under protest. In the SEC's memorandum in support of holding Lewis, D'Amato in contempt of the judgment, the SEC argued that the funds were held by Lewis, D'Amato for the benefit of Interlink and therefore were encompassed by the TRO, preliminary injunction and final judgment. The SEC claimed that, as set forth in Lewis, D'Amato's fee agreement, the funds were not a "retainer," i.e., a sum paid to secure the attorney's availability over a period of time. Rather, the funds were paid as a deposit against future costs, expenses and legal fees. Moreover, the SEC noted that the fee agreement required that the funds be kept in a client trust account, further evidencing the fact that the funds were for the benefit of the client.
 
 
 11
 Lewis, D'Amato argued, on the other hand, that the $70,000 total sum paid by Interlink to the firm was "present payment[ ] for future work"; as such, the funds became the property of Lewis, D'Amato upon receipt and were not frozen pursuant to the TRO or preliminary injunction. Lewis, D'Amato argued that Interlink's payment of an advance deposit was to induce the firm to provide legal services. In addition, the firm relied on the fact that the funds were deposited into the firm's general account, not a client trust account, to show that the funds became the property of the firm upon payment.
 
 
 12
 At the May 23, 1994 hearing on the parties' motions, the court, apparently influenced by the fact that the funds were deposited in the firm's general account, held that the funds were "a retainer which was earned by Lewis, D'Amato at the time of its employment." The court ordered the return of the funds to Lewis, D'Amato, stating in its June 6, 1994 written order that the $41,823.05 "was present payment for future work to be done by Lewis, D'Amato, Brisbois & Bisgaard. As such, it constituted an advance payment retainer, ownership of which passed from Defendants to Lewis, D'Amato, Brisbois & Bisgaard upon delivery."
 
 
 13
 The SEC appeals from this order.
 
 II.
 A. STANDARD OF REVIEW
 
 14
 We review de novo the question of whether under the terms of the Lewis, D'Amato fee agreement, the advance deposit was earned by Lewis, D'Amato upon payment or when services were rendered. See R.B. Matthews v. Transamerica Transp. Servs., Inc., 945 F.2d 269, 272 (9th Cir.1991) ("A district court's decision based on the language of a contract is a question of law that we review de novo."). However, we review the district court's determination regarding the scope of the injunctive relief granted, i.e., whether the advanced fee comes within the terms of the district court's own orders, for abuse of discretion. See Lou v. Belzberg, 834 F.2d 730, 733 (9th Cir.1987), cert. denied, 485 U.S. 993, 108 S.Ct. 1302, 99 L.Ed.2d 512 (1988) ("The grant or denial of a preliminary injunction will be reversed only where the district court abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact.").
 
 
 15
 B. DID THE DISTRICT COURT ERR IN DETERMINING THAT THE FUNDS ADVANCED BY INTERLINK TO LEWIS, D'AMATO WERE OWNED BY LEWIS, D'AMATO AND THEREFORE WERE NOT COVERED BY THE ASSET FREEZE IN THE TRO OR PRELIMINARY INJUNCTION?
 
 
 16
 The SEC contends that the funds deposited by Interlink with Lewis, D'Amato had not been earned by Lewis, D'Amato at the time of the entry of the TRO or preliminary injunction. Accordingly, the SEC claims the funds were "in the name, for the benefit or under the control of the Defendants" and were thus encompassed by the asset freeze provisions of the TRO and preliminary injunction. For the following reasons, we agree with the SEC that the funds paid in advance to Lewis, D'Amato were an advance against future fees and thus a portion of those funds had yet to be earned by Lewis, D'Amato when the asset freeze took effect. However, we remand to the district court for a determination of whether the unearned funds were encompassed by the asset freeze provisions of the TRO and preliminary injunction and therefore should have been deposited in the court registry pursuant to the final judgment.
 
 
 17
 To begin, Interlink deposited the funds with Lewis, D'Amato pursuant to its fee agreement. California law requires that an attorney's contract for services must be in writing where it is reasonably anticipated that fees and expenses will exceed $1,000. Cal. Bus. & Prof.Code § 6148(a). Here, the fee agreement specifically states:
 
 
 18
 4. DEPOSIT. It is the Firm's standard policy to obtain an advance deposit (herein the "Deposit") upon acceptance of representation in each new matter. In the event we have indicated that you are to make a deposit toward your legal fees in Exhibit A, you shall deposit the sum in our trust account. It will be used by us to pay costs, expenses, and fees for legal services. The Deposit shall be retained by the Firm as a non-interest bearing client deposit during the terms of this Agreement. Upon billing you, the Firm, at its option, any time prior to payment of such invoice by you, may apply the Deposit on account of such invoice. You agree to pay such invoice timely, in accordance with this Agreement (whether or not the Firm elects to apply all or part of the Deposit as provided for earlier in this paragraph). Upon payment by you of each such invoice to which the deposit shall have been applied, the Deposit shall be deemed "replenished" to the level of the original Deposit amount. The Deposit, as replenished each month during the term of this Agreement, shall be applied on account of the invoice (herein the "Final Invoice") issued by the Firm following the termination of the Firm's representation of you under this Agreement. Should the Final Invoice amount not exceed the then unapplied portion of the Deposit, the excess amount shall be refunded to you. Should the Final Invoice amount exceed the then available Deposit amount you shall pay the excess amount upon receipt of the Final Invoice.
 
 
 19
 According to the terms of the fee agreement, Interlink deposited funds with Lewis, D'Amato as an "advance deposit." The SEC and Lewis, D'Amato disagree, however, concerning both the nature of the "advance deposit" and, consequently, when the deposit was earned by Lewis, D'Amato. We conclude that, under the terms of the agreement, the advance deposit was not a classic retainer, nor was it an "advance deposit retainer" as argued by Interlink; rather, it was an advance against fees that was not earned by Lewis, D'Amato until legal services were rendered.
 
 
 20
 A classic retainer "is a sum of money paid by a client to secure an attorney's availability over a given period of time. Thus, such a fee is earned by the attorney when paid since the attorney is entitled to the money regardless of whether he actually performs any services for the client." Baranowski v. State Bar of Cal., 24 Cal.3d 153, 154 Cal.Rptr. 752, 757 n. 4, 593 P.2d 613, 618 n. 4 (1979). By contrast, a retainer given as an advance deposit against future fees constitutes property held in trust for the benefit of the client and, as such, is property of the client. See, e.g., In re Escalera, 171 B.R. 107, 111 (Bankr.E.D.Wash.1994) (under Washington law, an advance against fees are the client's funds); In re C & P Auto Transport, Inc., 94 B.R. 682, 690 (Bankr.E.D.Cal.1988) (retainer for future services is property of the bankrupt estate); In re Doors and More, 127 B.R. 1001, 1003-4 (Bankr.E.D.Mich.1991) (under Michigan law, a retainer for future services is unearned).[3]
 
 
 21
 Here, the Lewis, D'Amato fee agreement specifies that the deposit is an "advance deposit" that will be held in Lewis, D'Amato's client trust account. The fee was to be used to pay "costs, expenses and fees for legal services"--not to ensure availability of counsel. Further, under the terms of the agreement, Lewis, D'Amato had not yet earned the deposit. The agreement provided that the funds could not be used by Lewis, D'Amato until Interlink was presented with an invoice, at which time Lewis, D'Amato could use the deposit to pay the invoice. If the deposit was not used to pay invoice amounts, or if the agreement was terminated prior to use of the deposit, the excess amount of the deposit was to be "refunded" to Interlink. Thus, the Lewis, D'Amato fee agreement created an advance deposit against future fees that remained the property of Interlink until services were rendered.[4]
 
 
 22
 Lewis, D'Amato does not dispute that the "advance deposit" was not a classic retainer fee. Nor does it dispute that the fee agreement required that the funds be deposited in a client trust account, to be earned as Lewis, D'Amato rendered services to Interlink. Rather, Lewis, D'Amato argues that because it deposited that funds in its general account and because Lewis, D'Amato and Interlink considered the deposit to be "present payment for future work," the funds were earned upon payment to the firm.[5]
 
 
 23
 Lewis, D'Amato's failure to comply with the explicit terms of the fee agreement and its proffered interpretation of the unambiguous language governing the advance deposit cannot be used to interpret the agreement. Curry v. Moody, 40 Cal.App.4th 1547, 1552, 48 Cal.Rptr.2d 627, 630 (1995) (extrinsic evidence only admissible to prove meaning of ambiguous term that is reasonably susceptible to the proffered interpretation).[6] Lewis, D'Amato's arguments that the advance payment "was for the purpose of gaining [Lewis, D'Amato's] commitment to represent it" and that Lewis, D'Amato agreed to "pay Interlink the equivalent of any unused balance" are directly contradicted by the language of p 4 of the agreement.
 
 
 24
 Thus, Lewis, D'Amato did not "earn" the advance deposit until it rendered services to Interlink, and therefore the advance deposit was not "owned" by Lewis, D'Amato until that time. Accordingly, we reverse the district court's holding that the advance deposit was "present payment for future work to be done by Lewis, D'Amato ... [and] constituted and advance payment retainer, ownership of which passed from Defendants to Lewis, D'Amato ... upon delivery."[7]
 
 
 25
 Because the district court erred in determining that the advance deposit was earned by Lewis, D'Amato upon payment, it never reached the question of whether the unearned funds came within the terms of its TRO, preliminary injunction and final judgment. The TRO and preliminary injunction froze Interlink's assets, including "any funds or other assets in the name, for the benefit or under the control of the Defendants," held by any other person or entity which received notice of the orders. Because the district court made no finding with regard to whether funds not yet earned by Lewis, D'Amato were held for the benefit of Interlink, we remand the case to the district court to determine whether the portion of the advance deposit not yet earned by Lewis, D'Amato, was encompassed by its TRO, preliminary injunction and judgment.
 
 III.
 
 26
 For the foregoing reasons, we REVERSE and REMAND to the district court for a determination of whether the unearned portion of the advance deposit was encompassed by the TRO, preliminary injunction and judgment against Interlink.
 
 
 
 [1]
 In the June 7, 1993 hearing, Lewis, D'Amato raised the issue of the asset freeze's effect on "attorneys fees that we already have in our account." The court, however, after inquiring into the issue, stated "no application has been made, so I can't make a determination as to what are reasonable fees, counsel, and how much is going to be expended." The court then granted Lewis, D'Amato's request for an opportunity to file such an application
 
 
 [2]
 Interlink's first two checks payable to Lewis, D'Amato were returned for insufficient funds. Thus, the amount at issue consisted of the following payments:
 (1) a $25,000 check, dated May 4, 1993, from Interlink to Lewis, D'Amato;
 (2) a $20,000 cashier's check, dated May 18, 1993, from First Interstate Bank to Lewis, D'Amato; and
 (3) a $25,000 cashier's check, dated May 27, 1993, from Coast Federal Bank to Lewis, D'Amato.
 The first two checks were deposited into Lewis, D'Amato's general account. The third check was placed in a safe until March 4, 1994, at which time Lewis, D'Amato deposited the check into the client trust account.
 
 
 [3]
 This distinction between a retainer fee and an advance fee is confirmed by the "Handbook on Client Trust Accounting for California Attorneys." In discussing Rule 4-100 (which replaced Rule 8-101, the rule in effect at the time the parties entered into the fee agreement), the Handbook states "[a]n advance fee is money your client gives you upfront to pay the cost of legal representation. Unlike true retainers, which are paid to ensure your availability to a client and are therefore earned in full at the time you receive them, advance fees don't belong to you until you perform services for that client." See State Bar of California, Handbook on Client Trust Accounting for California Attorneys, p. 13 (1993)
 
 
 [4]
 Lewis, D'Amato claims that the fee agreement created a third type of retainer--"an advance fee retainer." Although some courts recognize a distinction between an "advance fee retainer" and a "security retainer," and have held that only the latter belongs to the client, In re McDonald Bros. Constr., Inc., 114 B.R. 989, 997-99 (Bankr.N.D.Ill.1990) (under Illinois law, advance fee retainer is earned upon payment), other courts do not recognize this distinction, In re GOCO Realty Fund I, 151 B.R. 241, 251 (Bankr.N.D.Cal.1993) ("Applying California law, there may be no difference in treatment of a security retainer and an advance payment retainer."), In re Montgomery Drilling Co., 121 B.R. 32, 37 (Bankr.E.D.Cal.1990) ("Under California law, the issue of whether ownership of [an advance payment retainer] passes to the attorney upon receipt is largely undecided."), while others explicitly reject it. In re Doors and More, 127 B.R. at 1002, n. 2 (concluding that Michigan law does not recognize any distinction between an advance payment retainer and a security retainer). We need not determine whether such a distinction exists under California law, for even if we were to recognize the distinction, the advance deposit provision in the Lewis, D'Amato fee agreement is virtually identical to the type of agreement that the court in In re McDonald Bros. describes as creating a security retainer
 
 
 [5]
 Lewis, D'Amato notes that the Rules of Professional Conduct did not require that the advance deposit be kept in a client trust account. This, however, is irrelevant, since the fee agreement itself explicitly required that the deposit be kept in a client account
 In addition, Lewis, D'Amato is only partially correct. Former Rule of Professional Conduct 8-101 required that " '[a]ll funds received or held for the benefit of clients by a member of the State Bar or firm of which he is a member including advances for costs and expenses, shall be deposited in one or more identifiable bank accounts labelled "Trust Account". ...' " Baranowski, 154 Cal.Rptr. at 757 n. 3, 593 P.2d at 618 n. 3 (emphasis supplied). Although it was undecided in California whether this rule encompassed an advance fee payment, advance payment of costs and expenses were specifically included within the rule. Id. 154 Cal.Rptr. at 757, 593 P.2d at 618. The advance deposit to Lewis, D'Amato was in part for costs and expenses, and therefore should have been deposited into a client trust account.
 
 
 [6]
 Moreover, the agreement does not permit any modifications or changes unless such changes are in writing
 
 
 [7]
 Because we reverse on this ground, we do not address the SEC's argument that the funds were fraudulently obtained by Interlink and therefore title to the funds never passed to Lewis, D'Amato