**In re MONTGOMERY DRILLING CO., Debtor.**

**Bankruptcy No. 189–01217–A–11K.**

United States Bankruptcy Court, E.D. California.

Oct. 26, 1990.

As Corrected Dec. 4, 1990.

Warren G. Greene and Lee J. Cohen, Rutter, O'Sullivan, Greene & Hobbs, Los Angeles, Cal., for debtor and debtor-in-possession.

W. Richard Lee, Kimble, MacMichael & Upton, Fresno, Cal., for Unsecured Creditors' Committee.

James Snyder, Fresno, Cal., for Office of the U.S. Trustee.

## ORDER APPROVING FEES OF RUTTER, O'SULLIVAN, GREENE & HOBBS AND LEE J. COHEN

RICHARD T. FORD, Bankruptcy Judge.

### INTRODUCTION

The hearing on the First and Final Application for Compensation by Rutter, O'Sullivan, Greene & Hobbs Incorporated ("ROGH") and Lee J. Cohen, counsel for the Debtor and Debtor-in-Possession, came on regularly before the above-entitled Court on September 26, 1990, at 1:30 p.m. Warren G. Greene and Lee J. Cohen, Applicants, appeared. W. Richard Lee appeared for the Unsecured Creditors' Committee, and James Snyder appeared for the U.S. Trustee's Office. The Court has also considered the Declarations of former Judges Ordin and Bergener.

A Response and Objection to the First and Final Application for Compensation to Debtor's Counsel was filed by the Unsecured Creditors' Committee. The United

States Trustee's Office also objected to the request for fees by Debtor's counsel.

ROGH filed a Reply to the U.S. Trustee's Comments and the Creditors' Committee's Response and Objections to the Application for Compensation.

At the hearing, each party stated their respective views to the Court, including Robert B. Montgomery, Sr., who testified in response to questions by the Court. The matter was then submitted.

## DISCUSSION

The Applicants seek an allowance of compensation in the total amount of $479,-691.01, and they are asking the Court to allocate $312,778.51 to ROGH and $166,-912.50 to Lee J. Cohen, a Professional Corporation. In addition, ROGH is seeking reimbursements of costs and expenses in the sum of $25,811.25.

At the commencement of the hearing, ROGH reduced their claim by $20,428.50 and $289.00. Lee J. Cohen reduced his claim in the sum of $990.00.

The compensation being sought by Applicants is in addition to a "pre-petition retainer" of $150,000.00 originally advanced by the Debtor. Of this amount, $4,559.00 was applied to legal services rendered by Applicants prior to March 22, 1989 in contemplation of filing the petition; $106,504.49 was applied to ROGH as legal fees and $7,061.51 as reimbursement of costs and expenses; and $31,875.00 was applied to Lee J. Cohen, as fees.

The compensation being sought is also in addition to a $1,036,160.87 contingency fee requested ROGH for handling three lawsuits against the limited partners of three different drilling rig limited partnerships (referred to as the MDLP litigation cases during the pendency of this matter).

The Creditors' Committee's objection, in summary, states that the fees requested by ROGH and Cohen are unreasonably high for the work that was done. They further object that the Application reflects excessive inter-office conferences, meetings, and hearings attended by multiple attorneys without sufficient explanation; that ROGH billed for preparation and defense of its Fee Applications in connection with work done on a contingency fee agreement covering work separate from the bankruptcy proceedings; and that the fees requested by Lee J. Cohen are grossly excessive in light of the results achieved. The Committee's recommendation is that the Court allow Mr. Cohen only $31,875.00, the sum received from the pre-petition retainer, and specifically disallow his request for an additional $166,912.00. In addition, the Committee contends that 288 hours of duplicate time was billed and requests that at least 50% of that amount be disallowed as time not reasonable and necessary to the administration of this case.

The U.S. Trustee objects to any amount being awarded to Mr. Cohen above and beyond that which he has already received from the pre-petition retainer. The U.S. Trustee alleges that there are several instances of Mr. Cohen's failure to abide by the Bankruptcy Code and Rules. The instances cited are use by the estate of a non-refundable deposit originating from a sale of real property; allowing for the payment of a real estate commission without the broker having been employed; soliciting support for a Plan before approval of the Disclosure Statement; preparing an application for an auctioneer as a professional; and using a pre-petition retainer without notice, hearing, or court order. The U.S. Trustee alleges that these items tend to detract from the fees requested by Mr. Cohen. In addition, the U.S. Trustee alleges that Applicants are charging for research, which should not be necessary by "experts" in bankruptcy; that multiple tasks are lumped into one time entry, making it impossible to determine what was done and how long it took to do it; that there was an excessive amount of time involved in the preparation of Plans and Disclosure Statements. In summary, the U.S. Trustee alleges that the fees charged by Debtor's counsels are, at the very least, excessive. No specific award is recommended.

Counsel for the Debtor, in their reply to the Creditors' Committee and U.S. Trustee, state as follows:

"In every case in which a judicial determination is required, the Court is called upon to weigh the competing interests affected. Hence, in the matter now before the Court on the allowance of attorney fees sought by counsel to the Debtor, Applicants respectfully submit that the Court's initial inquiry should be a determination of which competing interests will be affected by its ruling. Surely, the interests of the unsecured creditor body represented by the Committee will not be affected, nor does the Committee suggest otherwise. Under the confirmed Joint Plan, unsecured creditors will be paid in full, plus interest, regardless of how the Court rules on this Application for Compensation. Nor will any of the other classes of creditors, administrative, priority, or secured, be affected by the Court's ruling, since each will be paid in full.

The only interest to be affected by the Court's determination apart from that of Applicants, is that of Robert B. Montgomery, Sr., the sole equity holder."

It is unclear whether Counsel is suggesting that since only Mr. Montgomery Sr. will be affected, the Court and other parties should not investigate the requested fees and costs. Unquestionably, the Court must review the fees and costs requested to determine their necessity and reasonableness under the circumstances. In addition, and contrary to what Counsel states, creditors will be affected because the larger the administrative claims, the longer it will take to get funds for other creditors below the administrative claim level.

At the hearing, the Court asked the U.S. Trustee and Creditors' Committee attorney to respond to these allegations, to wit, why should they feel obligated to object to Debtor's fees as long as all the creditors were being paid in full? They stated that it was their duty, irrespective of payment to creditors, to make comments on fee applications and recommendations based upon their knowledge and participation in the case out of which the Application for Fees arose.

In addition, Robert B. Montgomery, Sr. appeared at the hearing at the Court's request and upon examination, Mr. Montgomery stated that he was "appalled" at the size of the fees requested in this case by all parties, but that he had no specific objection to the fees of Price Waterhouse, Davis Auctioneers, counsel for the Unsecured Creditors' Committee, and ROGH. However, respecting the amount of fees requested by Lee J. Cohen, without specifically objecting to the dollar amount, Mr. Montgomery, Sr. expressed an opinion that his services were less than satisfactory for the time spent and amounts charged.

In addition to many other lecturers, professors, and judges, Bankruptcy Judge Volinn, Chief Bankruptcy Appellate Panel Judge, has written on the subject of attorneys fees. In one of Judge Volinn's commentaries, he stated:

"Before proceeding to the primary subject, it would be appropriate to briefly comment on the role or perspective of the Judge to whom is entrusted the task of considering and allowing fees. It has been said that 'Looking over the shoulders of an attorney by examining their charges is not a task welcomed by judges. Even though our competence to undertake this scrutiny is limited at best, we must assume the burden as at present no other bearer is available.' *Planned Parenthood of Cent. and Northern Arizona v. Arizona*, 789 F.2d 1348, 1351 (9th Cir.1980), [1986] aff'd sub nom. *Babbitt v. Planned Parenthood of Cent. and Northern Arizona*, 495 [479] U.S. 925, 107 S.Ct. 391 [93 L.Ed.2d 346] (1986).

Thus, it falls to the Trial Judge to hear and review fee applications. It is the province of the trial court to review and allow fees in a setting where the inhibitions pertaining to the usual attorney-client relationship do not pertain. Counsel for a debtor or a trustee represent a bankruptcy estate which is not the typical client."

██ Therefore, whether we like it or not, or whether Debtors' attorneys like it or not, it is the job of the Bankruptcy Judge

to review and rule on the fees of the Debtor's attorney as well as other professionals. The views of all participants in the case are valuable in this instance.

To determine what fee is justified relative to the attorneys for the Debtor, one must first look at 11 U.S.C. § 330.

Section 330 in part provides:

(a) After notice to any parties in interest and to the United States Trustee ..., and subject to ... 326 ..., the court may award ...

(1) reasonable compensation for actual, necessary services rendered by such trustee ... based on the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this Title ...

THE APPLICANT HAS THE BURDEN OF PROVING THAT HIS REQUESTS FOR FEES AND COSTS ARE REASONABLE AND NECESSARY.

Prior to enacting the present Code, the 9th Circuit followed the "strict rule of economy" test whereby the Court was empowered to arbitrarily reduce compensation payable. See *In re THC Financial Corp.*, 659 F.2d 951, 954–956 (9th Cir.1981); *In re Beverly Crest Convalescent Hospital, Inc.*, 548 F.2d 817, 820–821 (9th Cir.1976). From this rule, two principles emerged: (1) fee awards must be compensatory; and (2) ceiling on any permissible award lies *below* that charged for equivalent services in the private market.

The 9th Circuit BAP departed from this view regarding compensation in 1986. (*In re Powerine Oil Co.*, 71 B.R. 767, 770 (9th Cir. BAP 1986)) The *Powerine* case involved attorney compensation and noted that the 9th Circuit applies the "lodestar" approach in awarding attorney fees [See also *In re Yermakov*, 718 F.2d 1465, 1471 (9th Cir.1983)] in that they considered (1) normal rate charged in non-bankruptcy, (2) prevailing rate for such work in the area of the time the work was done, and (3) number of hours worked, if any, by persons who billed their hours at a lesser rate. Although the Ninth Circuit has not expounded a specific constrictive set of standards to be employed in determining reasonable fees under § 330, cases from other circuits exist to augment those standards enunciated in the Ninth Circuit. In addition, there are other viable factors which can be used to support a decision in this case.

Without objection as to the pure addition or mechanical calculation from either the Creditors' Committee or the U.S. Trustee, Debtor's attorneys allege that 3,086 hours were spent on the bankruptcy portion of the Debtor's proceedings. The names, time spent, rates, and time value set forth in the Application are as follows:

| Attorney | Time | Applicable Hourly 1989/1990 Rates | Time Value |
|---|---|---|---|
| Warren G. Greene | 670.00 | 210/230 | $148,418.00 |
| Lee J. Cohen | 751.80 | 250/275 | 198,787.50 |
| Olivia Goodkin | 186.40 | 175/195 | 35,246.00 |
| Elaine M. Lustig | 1,148.80 | 155/170 | 182,503.50 |
| Neil G. Kenduck | 204.10 | 155/170 | 34,697.00 |
| Janine M. Roper | 22.40 | 135/150 | 3,360.00 |
| Thomas E. O'Sullivan | 1.00 | 23/250 | 230.00 |
| Marshall A. Rutter | .70 | 230/250 | 175.00 |
| Kenneth A. Braun | 28.70 | 210/230 | 6,217.00 |
| Frank D. Hobbs | 1.80 | 210/230 | 414.00 |
| Steven G. Polard | 3.30 | 195/___ | 643.50 |
| Hollis L. Kulwin | 2.30 | 155/170 | 391.00 |
| Nikki A. Westra | 2.30 | 145/___ | 322.00 |
| B.F. Pierce Gore | 27.90 | 125/145 | 4,045.50 |
| Pamela M. Brown (law clerk) | 19.90 | 95/___ | 1,890.50 |
| Jamie B. Feuerman (first year law clerk) | 14.60 | ___/50 | 730.00 |
| TOTAL | 3,086.00 | | $618,070.50 |

On April 20, 1989, the attorneys for Debtor filed their Application for Employment of Attorneys by Debtor and Debtor–in–Possession, "with compensation to be paid as an administrative expense in such amounts as this Court may hereafter determine and allow." Page 23 of Application filed April 20, 1989. Among other things, the individual rates charged by the firm's lawyers in 1989 were set forth on Page 27 of the Application as Exhibit "B." In addition, the Application revealed that there were three separate lawsuits pending by the Debtor against limited partners (MDLP litigations) involving three separate drilling rig limited partnerships.

Debtor's attorneys requested an order allowing them to continue representation of the Debtor in the MDLP litigations under a contingency fee agreement. The Court approved their employment on May 18, 1989. As a result of ROGH pursuing the lawsuits covered by the Contingency Fee Agreement, they requested the sum of $1,136,-160.00 and agreed to settle (after a stipulation with the Unsecured Creditors' Committee and the U.S. Trustee) for the sum of $916,079.00.

On Page 22 of the Application for Employment, Debtor's counsel revealed that prior to the filing of the Chapter 11 case, to wit one day before, the Debtor paid to ROGH from its funds the sum of $150,-000.00. Of that amount, $500.00 was allocated to the payment of the filing fee for the Chapter 11 Petition and $149,500.00 was allocated to ROGH as a retainer fee for *services rendered and to be rendered.* There was no further disclosure at that time regarding the attorney/client agreement entered into between Montgomery Drilling Company by Robert B. Montgomery, Jr., and Warren Greene for ROGH. A copy of that Agreement was not attached as an exhibit, although ROGH attached several other exhibits including an Attorneys Lien and Security Agreement having effect as of February 22, 1989, and a Contingency Fee Agreement effective as of March 1, 1989.

After a hearing on May 18, 1989, the Court signed an Order Authorizing Retroactive Employment of Attorney and Approval of Rates (then in effect) but subject to court policy and 11 U.S.C. § 328(a) of the Bankruptcy Code. In addition, the Contingency Fee Contracts were approved. There was no discussion by anyone at that time relative to the "attorney/client agreement" reference a "retainer."

RETAINER AGREEMENT:

In contemplation of seeking bankruptcy protection, Debtor entered into an "Attorney–Client Agreement" with Applicant on March 21, 1989, one day prior to Debtor's petition. The Court requested a copy of this Agreement at the September 26, 1990 hearing, and a copy was received October 1, 1990. The agreement was executed by Robert B. Montgomery, Jr., on behalf of the Debtor, and by Warren G. Greene on behalf of Applicant.

Paragraph 1 of the Agreement clearly evinces an intent by both Debtor and Applicant that the Agreement applies solely to Applicant's representation of Debtor in the bankruptcy reorganization. It was acknowledged at the September 26, 1990 hearing and set forth in the Agreement that $149,500.00 was paid to Applicant as a retainer fee. Further, the Agreement provides that the retainer was "fully earned by the Firm" concurrently with its payment.

Essentially, three types of retainers exist, being (1) Classic or True Retainers, (2) Security Retainers, and (3) Advance Payment Retainers. See *In re McDonald Brothers Construction, Inc.,* 114 B.R. 989 (N.D.Ill.1990). Classic Retainers refer to the payment of a sum of money to secure availability over a period of time. Entitlement to the fee exists whether or not services are ever rendered. Noting that the specific language in Paragraph 2 relates that the retainer fee may be subject to review by the Bankruptcy Court and that the Agreement specifically calls for representation in these proceedings, this Court

finds and holds that it was not the intent of Applicant or Debtor that this retainer be a Classic Retainer designed solely to secure the availability of the Applicant over a period of time.

■ The other two types of retainers are the Security Retainers and Advance Payment Retainers. The Security Retainer is typified by the fact that the retainer will be held by the attorneys to secure payment of fees for future services that the attorneys are expected to render. In such an agreement, the money given as a retainer is not present payment for future services. Rather, it remains property of the Debtor until the attorney applies it to charges for services actually rendered, and any unearned funds are returned to the Debtor.

■ The third type of retainer, the Advance Payment Retainer, is an agreement whereby the Debtor pays, in advance, for some or all of the services that the attorney is expected to perform on the Debtor's behalf. This type of retainer differs from the Security Retainer in that ownership to the funds is intended to pass to the attorney at the time of payment. Under California law, the issue of whether ownership of these funds passes to the attorney upon receipt is largely undecided. See *Katz v. Workers' Compensation Appeals Board*, 30 Cal.3d 353, 356 fn. 2, 178 Cal.Rptr. 815, 636 P.2d 1153 (1981); *Baranowski v. State Bar*, 24 Cal.3d 153, 164, 154 Cal.Rptr. 752, 593 P.2d 613 (1979).

■ In reviewing former California Rules of Professional Conduct 8–101, this Court views the language contained therein as indicating an intent by the State Bar that funds retain an ownership identity with the client until earned. This also comports with the view of the San Francisco Bar Legal Ethics Opinion SF 1980–1; see also *In re McDonald Brothers Construction, Inc., supra,* 114 B.R. at p. 1001 fn. 15. Rule 8–101, was in effect at the time the Agreement was entered into (March 21, 1989), and up and until May 26, 1989. Accordingly, this Court finds and holds that

under Rule 8–101, the funds placed as a retainer were funds held by Applicant for the benefit of Debtor.

■ Returning to the language in the Agreement, many inconsistencies exist therein. First, the second paragraph indicates that the client agrees that the fees were fully earned concurrently with its payment. Immediately thereafter, it is indicated that the reasonableness of the amount of the fee may be subject to the review of the Bankruptcy Court. Looking to the first paragraph, the language indicates that the monies are provided to allow the Applicant to effectively render services reasonably required in its representation of the Debtor in the bankruptcy proceedings. Although an argument can be made that such payment was an Advance Payment Retainer (some Courts hold that the ownership to the retainer passes to the attorney at the time of payment, i.e., see *In re McDonald Brothers, supra*), this Court finds and holds that these fees were placed by the Debtor with the Applicant to secure payment for future services that the Debtor rightfully expected Applicant to render. Combined with the fact that the Agreement was entered into only one day prior to the filing of the petition, and that $500.00 of the total $150,000.00 was allocated for the payment of filing fees, with the remainder as a retainer fee for services rendered and to be rendered, this Court finds and holds that the retainer agreement is a Security Retainer. The Debtor reasonably expected that the Applicant would perform and render future services in the case. This is aptly set out under the Retention of Counsel paragraph in Applicant's Application at page 22. Accordingly, this Court finds and holds that the retainer fee of $149,500.00, being a Security Retainer, is property of the estate.

■ Respecting the so-called "retainer," the Court also notes, as did the United States Trustee's Office, that there has been no Application made for payment or use of these funds as required under § 327 and § 330 of the Bankruptcy Code. The Appli-

cants have violated these fundamental tenets of the Bankruptcy Code. The Court urges and advises that, in future cases where these types of retainer agreements are entered into, the appropriate Application be made to the Court and set for hearing. Had the retainer been placed in a trust account where it should have been, then it would have drawn interest for the benefit of the Debtor. A Retainer Agreement cannot be used by professionals employed by the Debtor to circumvent the requirement of a Fee Application reference the reasonableness and value. *In re C & P Auto,* 94 B.R. 682 (Bankr.E.D.Cal.1988). There would be nothing gained by requiring Applicant to go back and renotice the Application for Fees reference the retainer services, and the Court will consider this Application as one covering the entire case.

## ENHANCEMENT UNDER MANOA FINANCE AND REDUCTION APPLYING INVERSE REASONING

### MANOA FINANCE (ENHANCEMENT) RULE:

In the case of *In re Manoa Finance Company, Inc.,* 853 F.2d 687 (9th Cir.1988), the Court held that compensation awards under the Bankruptcy Code may be *enhanced* only in exceptional circumstances where the applicant produces specific evidence that the award based on standard hourly rate and actual hours worked does not compensate for work done.

The *Manoa* Court, in determining a reasonable attorney fee under the Bankruptcy Code, considered the general principles applicable under fee-shifting statutes for fee enhancement purposes. They did this on the basis of the factors set forth in *Kerr v. Screen Extras Guild,* 526 F.2d 67 (9th Cir. 1976), cert. denied, 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976) citing with approval *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–719 (5th Cir. 1974). The factors in the *Kerr* case are: (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal services properly; (4) the preclu-

sion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

■ A compensation award based on a reasonable hourly rate multiplied by the number of hours *actually, reasonably, and necessarily expended* is presumptively a reasonable fee.

### REDUCTION UNDER INVERSE REASONING:

■ Just as the *Manoa* case stands for the proposition that, in an exceptional case, fees can be enhanced, logically and reasonably the antithesis (or converse) of that proposition holds true, to wit, *fees can be reduced for less than exceptional [and in certain instances as indicated herein, less than average] performance,* considering the factors listed in the *Kerr* case.

So what are the factors in this case, if any, to be considered as reasons for reducing counsel's requested fee?

During the latter part of 1989, the Court detected and admonished counsel for the Debtor, as well as other parties, that the case was dragging. On or about December 13, 1989, the Court required the parties, to wit, the Debtor, the largest Bank creditor, the U.S. Trustee, and the Unsecured Creditors' Committee, to meet and confer. It was obvious that counsel for the Debtor thought that delay would benefit them (tactically speaking) in negotiations with the Bank and the Creditors' Committee. The Debtor's delay almost caused the appointment of a Chapter 11 Trustee, which the Court felt was overdue. At the last minute, before the Trustee Motion was to be heard, the Debtors did file a Disclosure Statement and Plan, both of which hardly approached Code requirements. This is when the case, practically speaking, began.

As shown above, Debtor's Counsel alleged that they spent 3,086 hours in this case. Of those hours, the Creditors' Committee and U.S. Trustee allege that 280–288 hours were for duplicative services. Counsel for the Debtor disagrees and states on Page 9 of his Reply to Opposition of U.S. Trustee and Creditors' Committee that:

"Where more than one attended a hearing or meeting, such attendance was necessary either because of information possessed by that attorney and no one else, or because that attorney required the input from the meeting or hearing ..."

To refer to one billing date, to wit, November 16, 1989, the following was charged:

| 11/16/89 | | | |
|---|---|---|---|
| Attend luncheon meeting in Bakersfield with Messrs. Montgomery and Laughlin regarding motion to appoint trustee. | WGG | 1.50 |
| Attend court hearing regarding motion to appoint trustee and for approval of sale of portions of two rigs. | WGG | 6.00 |
| Meeting with prospective rig purchasers following hearing. | WGG | .50 |
| Travel to and attend hearing in Bakersfield regarding motion to appoint trustee, meet with rig purchaser following hearing. | EML | 10.50 |
| Travel to Bakersfield and to Court for hearing on motion to appoint trustee and meet with client. | LJC | 9.20 |
| Thereafter conference with counsel for Creditors Committee and Glenfed. | LJC | .80 |

Mr. Greene's rate in 1989 was $210.00; Mr. Cohen's rate in 1989 was $250.00; and Miss Lustig's rate in 1989 was $155.00. The total billed to the estate on November 16, 1989, was $5,807.50, of which $2,430.00 was for travel.

It would appear that if Mr. Greene's and Mr. Cohen's appearances were absolutely necessary, then either could have handled the matter for Elaine Lustig reference a sale of an oil drilling rig.

There are many other similar examples, including but not limited to those occurring on October 2, 1989, December 13, 1989, December 18, 1989, March 27, 1990, May 25, 1990.

Counsel for the U.S. Trustee and Creditors' Committee allege that 74 hours of unnecessary research were performed by experts in the bankruptcy field. As set out in the U.S. Trustee's Opposition, the research involving the following should not have been necessary:

"Employment of Price Waterhouse (4/18/89). An application to approve contracts to employ Montgomery Drilling principals (4/19/89). Offsets and effect of stay on litigation (4/24/89). Automatic stay (4/25/89). Automatic stay in connection with assumption agreement litigation (5/4/89). Adequate protection issues (5/12/90). Approval of rig sale free and clear of liens (5/16, 17 & 18/90). Requirements for offset of lien (5/22/89). Amending schedules (5/24/89). Voidable preferences and tax liens (5/31/89). Automatic stay of MDLP cases and complaint for relief (6/12/89). Opposition of the creditors committee to debtor's sale request (6/21/89). Automatic stay and unemployment tax (8/10/89). Employment of an engineer (1/2 & 4/89). Fee application (10/12/89). Trustee appointment issues (11/2/89). Cramdown (11/2/89). Adequacy of disclosure statement and committee standing to object (12/4/89). Court jurisdiction over non-debtor subsidiaries (2/2/90). Fee applications and contingency fees (2/4 & 5/90). Standards for allowance of compensation to

attorneys (2/5/90). Cramdown and acceptance of plan by Glenfed (4/2/ & 3/90). Debtor's right to object to a creditor plan (4/10/90). Disgorgement of improperly paid monies and retroactive employment (5/31/90). Stipulation for relief from stay (6/5/90). Exception from automatic stay for government actions (6/19/90). Fee applications for debtor's counsel (7/3/90). Standing to request and receive special notice (7/16 & 17/90). Filing adversary proceeding after confirmation (7/31/90).

Both the U.S. Trustee and Creditors' Committee have calculated that Debtor's counsel spent approximately 144 hours on the subject matter of having a trustee appointed. They consider the time spent as excessive. Counsel for the Debtor considers it one of the most important aspects of the case in that they did not want to lose control of the corporation.

The Court feels that some of the time spent was excessive, unreasonable, and unnecessary. Had counsel moved the case along a faster track, including the timely filing of a Plan and Disclosure Statement, there would probably have been no need for the filing of a Motion to Appoint a Trustee.

The Creditors' Committee also objects to excessive inter-office conferences without sufficient explanation showing a need; to billing for preparation and defense of its fee application in connection with the Contingency Fee Settlements (the Creditors' Committee and Debtor's counsel agree to reduce their fee application by $20,428.00 and $990.00); and feels the fees requested are grossly excessive in light of the results, particularly as it refers to Mr. Cohen.

In addition to the items specifically set forth above, the U.S. Trustee also objects to the employing of two accountants at the same time to do the same job, to the fact that Mr. Cohen did not perform certain services that benefited the estate, that Mr. Cohen's billing rate is excessive, that Debtor's counsel illegally allowed a non-debtor entity to use a non-refundable deposit that came from a sale of estate property, that Debtor's counsel did not prevent the payment of a broker's commission without an employment order, that a fee applied for by a third party professional was prepaid; and that a so-called pre-petition retainer was used without Court authorization after notice and hearing.

The U.S. Trustee alleged that an excessive amount of time (61.2 hours) was spent in preparing this Fee Application; that 803.4 hours were spent in preparation of the Plans and Disclosure Statements; that 45.6 hours were spent in preparing/amending the Debtor's schedules; and that 42.1 hours were spent in preparing the application to be employed. These hours are alleged to be excessive.

■ Some other charges listed in the detailed time records of Debtor's attorney have been reviewed by the undersigned (and paraphrased). They are as follows:

1. Billings in Reference to Preparation and Filing of an Application to Limit Service on Parties:

| | | |
|---|---|---|
| 4/17 —research to limit service | EML | 3.20 |
| 4/18 —revise application to limit service | EML | 1.10 |
| 4/20 —review and revise application to limit service | WGG | .20 |
| 4/21 —revise application to limit service | EML | .20 |

The documents pertaining to this service are located in the Court's file at Volume 1, Document No. 16, filed on May 5, 1989. The Application consists of two pages and is elementary. The Declaration of Mr. Greene is one and one-half pages, containing basic elementary information. The Points and Authorities is two pages long and cites one Bankruptcy Code section, one Bankruptcy Rule, and three elementary cases. The Notice is two pages and is nothing unusual. It would appear to the undersigned that all of these documents could have been prepared by a secretary or a paralegal in less than 45 minutes. Charges, however, to the estate are 4.50 hours at $155.00 per hour for a subtotal of $697.50, plus 0.20 hours at $210.00 per hour

for a subtotal of $42.00, for a total cost to the estate of $739.50.

2. Billings in Reference to Application to Appoint Auctioneer:

| | | |
|---|---|---|
| 5/23 —prepare application to appoint auctioneer | EML | 2.00 |
| 5/24 —review of application | WGG | 0.10 |
| 5/24 —revise and file application | EML | 1.70 |

The total time charged for the preparation of an Application to Employ an Auctioneer was 3.80 hours. These documents are located in Volume 2 of the Bankruptcy Court's file at Documents No. 62 and No. 66. The Declaration of the auctioneer is three and one-half pages and contains facts that the auctioneer supplied. The Application is one and one-quarter pages and is elementary. The Points and Authorities is one and one-half pages and cites two Bankruptcy Code sections and Collier and is rudimentary. The total charge to the estate is $585.50. This Application and related documents could have been prepared by a paralegal in less than one-half hour.

3. Billings in Reference to Motion to Extend Exclusivity Period for Filing of Plan by Debtor:

| | | |
|---|---|---|
| 6/22 —begin preparation of motion | EML | .60 |
| 6/23 —research and draft | EML | 3.60 |
| 6/24 —draft and revise | EML | 2.20 |
| 6/26 —revise | EML | 1.80 |
| 6/27 —revise | EML | .70 |
| 6/27 —revise/prepare Cohen's declaration | LJC | .70 |

The total time spent on this motion is 9.60 hours. These documents are located in the Court's file at Volume 4, Documents No. 102 and No. 103. Document No. 102 is a Motion containing two pages of elementary information. The Points and Authorities is four pages and cites one Bankruptcy Code section, Collier, three cases, and one legislative history section. The Declaration of Cohen is three pages and contains basic information. The Notice is three pages containing the same information. The total charge to the estate by EML is 8.90 hours at $155.00 per hour, for a subtotal of $1,379.50. Mr. Cohen charges 0.70 hours at $250.00 per hour, for a subtotal of $175.00, for a total billed to the estate of $1,554.50. These documents could have

been prepared by a paralegal in no more than one hour to one and one-half hours at the most.

4. Billings in Reference to Motion to Extend Time to Assume Lease:

| | | |
|---|---|---|
| 5/3 —research | EML | 2.50 |
| 5/3 —drafted Motion | EML | 1.50 |
| 5/4 —redrafted Motion | EML | 2.10 |
| 5/4 —review and revise Motion | WGG | .40 |
| 5/6 —review Motion | EML | 2.00 |
| 5/11 —revise Motion and calendar it | EML | .40 |
| 8/16 —revise Motion | EML | 1.30 |
| 8/18 —revise Motion | EML | 2.00 |

The hours charged on this motion total 12.20. In looking at the Bankruptcy Court file, Document No. 36, the Motion to Extend the Time is two and one-half pages of rudimentary material, the Declaration of Mr. Montgomery, Jr., is one-half page, and the Points and Authorities consists of three pages citing two Bankruptcy Code sections and three cases, all of which is very elementary. The charge to the estate is $1,877.00. This work could have been accomplished by a paralegal or an associate lawyer for 1/10th the amount charged to the estate.

5. Billings in Reference to Application to Employ an Engineer:

| | | |
|---|---|---|
| 10/2 —research | EML | 1.10 |
| 10/4 —research and draft application | EML | 3.00 |
| 10/6 —letter and revise application | EML | .20 |
| 10/24—revise order | EML | .20 |

This totals 4.50 hours at $155.00 per hour, for a total charge to the estate of $697.50. It would seem that research regarding this issue is clearly inappropriate. An Application, Declaration, and proposed Order could be prepared by a secretary or at least a paralegal at a total cost to the estate of no more than $100.00 to $150.00.

6. Billings in Reference the Employment of a Financial Consultant:

| | | |
|---|---|---|
| 10/6 —draft application | EML | 1.30 |
| 10/6 —telephone call to Blalock | EML | .20 |
| 10/8 —revise | EML | .40 |
| 10/9 —revise | EML | 1.20 |
| 10/24—revise order | EML | .20 |

A total of 3.30 hours was charged at the rate of $155.00 per hour, for a charge to the estate of $511.50. An Application, Declaration, and proposed Order could be prepared by a secretary or at least a paralegal at a total cost to the estate of no more than $100.00 to $150.00.

7. Billings Reference Research and Drafting of Motion to Continue Hearing on KMU's Fee Application:

| | | |
|---|---|---|
| 6/29 —research and draft motion | EML | 1.20 |
| 6/29 —conference with EML | JMR | .20 |
| 6/29 —research reference motion | JMR | 1.50 |
| 6/30 —revise | EML | .10 |
| 7/2 —revise | EML | .40 |
| 7/2 —review | WGG | .20 |

A total of 3.60 hours was charged to the estate, for a total charge to the estate of $590.00. In looking at the documents filed with the Court, the Motion is a one-page document. The Points and Authorities are two and one-half pages, citing one Bankruptcy Code section and two cases. It would seem to the undersigned that this was an extremely fundamental document that could have been dictated by Elaine Lustig in a half hour.

TRAVEL:

The order of May 18, 1989, appointing counsel for the Debtor, on page 2, states that the employment is subject to 11 U.S.C. § 328 and the policy of the Court. Some judges allow full travel time. Some judges do not allow any travel time to attorneys employed out of the District. *In re Pacific Express*, 56 B.R. 859; 13 BCD 1343 (Bankr. E.D.Cal.1985). Some Courts allow travel time if it occurs between 8:00 a.m. and 5:00 p.m., but there must be a clear showing that local counsel was not available. Some judges allow travel time, specifically set out in the application for fees at one-half the hourly rates.

 It is this Court's policy only to allow one-half of the hourly rate for travel time occurring between 8:00 a.m. and 5:00 p.m. if the travel time is specifically set out in the fee application. In Debtor's Application, the travel time is apparently charged at full hourly rates and it is commingled and lumped with other services.

The Court has reviewed the files, the docket, and Debtor's attorney's Fee Application, and it appears the following charges have been made for pure travel time by the various attorneys to the various court locations on the dates set forth below:

TO FRESNO:

| Date of Travel | Fee Charged | Costs Billed | Attorney |
|---|---|---|---|
| 7/6/89 | $ 620.00 | $26.00 | EML |
| 7/6/89 | 840.00 | 50.00 | WGG |
| 10/2/89 | 840.00 | 23.00 | WGG |
| 10/2/89 | 1,000.00 | | LJC |
| 12/13/89 | 840.00 | | WGG |
| 12/13/89 | 620.00 | | EML |
| 12/13/89 | 1,000.00 | | LJC |
| 2/5/90 | 920.00 | 294.00 | WGG |
| 7/10/90 | 680.00 | | EML |
| 7/10/90 | 920.00 | | WGG |
| | $8,280.00 | | |

TO BAKERSFIELD:

| | | | |
|---|---|---|---|
| 5/18/89 | (Cost of $40.00 is billed, but no travel charge can be ascertained.) | | |
| 5/30/89 | (Cost of $34.00 is billed, but no travel charge can be ascertained.) | | |
| 6/7/89 | 840.00 | 40.00 | WGG |
| 6/7/89 | 1,000.00 | | LJC |
| 6/22/89 | (see no charge for travel or costs) | | |
| 7/20/89 | (see no charge for travel or costs) | | |
| 9/21/89 | | 13.33 | WGG |
| | (cannot tell whether Greene charged for travel time to Bakersfield or not.) | | |
| 11/16/89 | 840.00 | | WGG |
| 11/16/89 | 1,000.00 | | LJC |

44

| Date of Travel | Fee Charged | Costs Billed | Attorney |
|---|---|---|---|
| 11/16/89 | $620.00 | | EML |
| 3/21/90 | 920.00 | | WGG |
| 4/17/90 | 1,100.00 | | LJC |
| 4/18/90 | 920.00 | | WGG |
| 4/26/90 | 1,100.00 | | LJC |
| 4/26/90 | 920.00 | | WGG |
| 7/26/90 | 920.00 | | WGG |
| 8/22/90 | 920.00 | | WGG |
| 8/22/90 | 1,100.00 | | LJC |
| | $12,200.00 | | |

It is impossible to determine the exact billings reference travel since the travel items are not separately stated from the other claimed billing items. THE APPLICANT HAS THE BURDEN OF PROVING FEES ARE REASONABLE AND NECESSARY.

INCREASED RATES WITHOUT COURT APPROVAL:

Commencing 1990, counsel for the Debtor increased their hourly fees from $210.00 to $230.00 per hour for Mr. Greene, from $250.00 to $275.00 per hour for Mr. Cohen, and from $155.00 to $170.00 for Ms. Lustig without any authorization from the Court and, presumably, without any authorization from Mr. Montgomery, Sr. The Court is cognizant of the fact that the Fee Application asks for the Court's approval of the normal hourly rate. Neither the Application or Order provided for an upward revision of fees. Counsel could have sought a Court Order providing for increases after a hearing. (There were certainly many opportunities.) Disclosure is the key. After all, if the Debtor and its officers had refused the hourly increase, they were so tied up with the ROGH firm in January 1990 that it would have been nearly impossible to substitute in a new firm without great additional cost.

CONCLUSION

▉ Therefore, for all of the reasons stated, specifically counsel's using a "retainer" fee without approval, for increasing their rates without approval, for charging over $20,000.00 in travel time to Court without proving it is within the Court's

guidelines, for excessive fees regarding all matters in this reorganization, for their duplicative work, for their unnecessary work, a reduction in requested fees will be interposed. In determining the percentage reduction interposed, the Court recognizes these flat percentages could be attacked as arbitrary. With this in mind, the court has painstakingly evaluated many relevant factors in determining the reduction that would fairly and most closely reflect a reasonable fee for ROGH and Cohen. For example, the Court has considered the rates previously approved based upon Applicants' representations of their expertise in bankruptcy law and related matters pertinent to the Debtor's estate; the Court has considered the higher cost of doing business in Southern California; the Court has considered the complexity of this case, including the tactical considerations of Debtor's counsel at the onset; combined with the other factors set forth under *Kerr* and applying this Court's reverse *Manoa* criteria, fees will be reduced as follows:

1. On the application for fees of ROGH (exclusive of the fees of Cohen), the Court has added the fees requested in this Application of $312,778.00, plus the fees used from the retainer of $106,504.00, and arrived at a total of $419,282.00. From that, the Court has deducted 10% (the amount of the unauthorized raise in rates in 1990 of the fees claimed in 1990, to wit, $387,875.00 in round figures, and allowed ⅔ to ROGH and ⅓ to Cohen) to wit, $23,333.00, leaving a gross balance of requested fees of $395,949.00. From that the Court has deducted $20,428.00 and $289.00, the amount Mr.

Greene agreed to deduct from his request, leaving a subtotal of $375,232.00. From that, applying the reduction test, the Court deducts 15% (of $395,949.00). This amount represents what the Court concludes as a reverse *Manoa* figure for the reasons stated above. Then subtracting $106,504.00 that counsel has already removed from the estate, it leaves a net of $209,336.00 due as an administrative claim.

2. On the application for fees of Cohen (exclusive of the fees of ROGH), the Court has added the fees requested in this Application of $166,912.00, plus the fees used from the retainer of $31,875.00, and arrived at a total of $198,787.00. From that, the Court has deducted 10% (the amount of the unauthorized raise in rates in 1990 of the fees claimed in 1990, to wit, $387,875.00 in round figures, and allowed ⅔ to ROGH and ⅓ to Cohen) to wit, $11,666.00, leaving a gross balance of requested fees of $187,121.00. From that the Court has deducted $990.00, the amount Mr. Cohen agreed to deduct from his request, leaving a subtotal of $186,131.00. From that, applying the reduction test, the Court deducts 25% (of $187,121.00). This amount represents what the Court concludes as a reverse *Manoa* figure for the reasons stated above. Then subtracting $31,875.00 that counsel has already removed from the estate, it leaves a net of $107,476.00 due as an administrative claim.

The Court has considered the Debtor's attorneys' statements and declarations, the U.S. Trustee statements, the Creditors' Committee's statements, the Court's own review and findings, and, equally important, the Court has considered Mr. Robert Montgomery, Sr.'s statements at the fee hearing on September 27, 1990, that "he was appalled at the fees charged." The Court feels that these interposed fees are fair and reasonable considering all of the above, keeping in mind that the Applicants have the burden of proving the requested fees are reasonably necessary.

Upon the Application, and there being no objection, IT IS FURTHER ORDERED that Debtor is authorized to obtain reimbursement from Montgomery Equipment

Co. of 25% of all amounts paid to Rutter, O'Sullivan, Greene & Hobbs Incorporated and Lee J. Cohen, A Professional Corporation, under this Order and from the initial retainer.

ROGH and/or Mr. Cohen will undoubtedly feel that the Court should not have reduced the requested fees and should not have taken into consideration the unauthorized fees received pursuant to a so-called Retainer Agreement. IF ROBERT B. MONTGOMERY, SR. DISAGREES WITH THE COURT'S FEE RULING, HE IS CERTAINLY FREE TO MAKE WHATEVER ADDITIONAL PAYMENTS, IF ANY, HE MAY THINK FAIR UNDER THE CIRCUMSTANCES.